Filed 12/28/17

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S232218 |
| v. | ) | |
| | ) | Ct.App. 2/5 B259665 |
| MARVIN TRAVON HICKS, | ) | |
| | ) | Los Angeles County |
| Defendant and Appellant. | ) | Super. Ct. No. MA058121-01 |
| _____ | ) | |

In this case, we decide whether during a retrial of a second degree murder charge, after a previous jury failed to reach a verdict on that charge but convicted the defendant of gross vehicular manslaughter while intoxicated (along with other offenses), the new jury should be informed of the specific convictions that resulted from the previous jury's deliberations. We conclude that the trial court errs if it informs the new jury of such specific convictions. The trial court does *not* err, however, if pursuant to Penal Code sections 1093 and 1127, it instructs the retrial jury along the following lines: "Sometimes cases are tried in segments. The only question in this segment of the proceedings is whether the prosecution has proved the charge of murder. In deciding this question, you must not let the issue of punishment enter into your deliberations. Nor are you to speculate about whether the defendant may have been, or may be, held criminally responsible for his conduct in some other segment of the proceedings." The foregoing instruction, which need only be given upon request, would prevent the jury from wrongly

1

**SEE DISSENTING OPINION**

assuming that an acquittal on the murder charge would result in the defendant escaping criminal liability altogether, and it would do so without introducing matters that are extraneous to the retrial.

Here, defense counsel requested a specific instruction informing the retrial jury of defendant's gross vehicular manslaughter conviction, and the trial court refused such an instruction, stating that it was "going to preclude any reference to the prior trial, or the prior verdict." In light of the court's broad statement, the defense cannot be faulted for failing to request an instruction like the one we approve today. Therefore, we must consider the question of prejudice. We conclude that the failure of the trial court to give the instruction we approve today was not prejudicial, and we affirm the judgment of the Court of Appeal.

### FACTS AND PROCEDURAL BACKGROUND

High on marijuana and phencyclidine (PCP), defendant Marvin Travon Hicks fled police in his black Toyota Camry, running several red lights and reaching speeds of about 100 miles per hour. Defendant eventually plowed into the side of a blue Lexus, killing two-year-old Madison Ruano, and injuring Tina Ruano, Madison's mother. The District Attorney of Los Angeles County filed an information charging defendant with murder (Pen. Code, § 187, subd. (a)) (count 1), evading an officer resulting in injury (Veh. Code, § 2800.3, subd. (a)) (count 2), evading an officer resulting in death (Veh. Code, § 2800.3, subd. (b)) (count 3), gross vehicular manslaughter while intoxicated (Pen. Code, § 191.5, subd. (a)) (count 4), and driving under the influence causing injury (Veh. Code, § 23153, subd. (a)) (count 5). After a jury trial, defendant was convicted on all counts except the murder count. The jury deadlocked on the murder count, and the court declared a mistrial as to that count.

At the retrial of the murder count, evidence tending to show the following facts was presented to the jury. At about 5:00 p.m. on Thursday, December 6,

2

2012, defendant drove a black Toyota erratically and at very high speeds through the City of Lancaster in Los Angeles County. Sheriff's deputies pursued him, lights and sirens activated. At one point, the Toyota ran a red light, lost traction, and came to a halt at the curb. A sheriff's deputy approached the vehicle, and defendant gave him a "blank stare," growled, and then sped away, veering into oncoming traffic, running another red light, and nearly hitting several vehicles.

At the same time, Tina Ruano was approaching a nearby intersection, driving a blue Lexus. Her two-year-old daughter, Madison Ruano, was in the car with her. When the light turned green, Tina entered the intersection, and the last thing she remembered was a black car coming from the right. She regained consciousness while in an ambulance on the way to the hospital. Witnesses described a dramatic collision between defendant's Toyota and the Lexus, with the Toyota going 80 to 100 miles per hour.

After the collision, sheriff's deputies approached defendant's vehicle. Defendant was screaming, laughing, and talking to himself, but he was alert and oriented. He was aware that he had been in a collision, that he was wearing a seatbelt, that he had just run a red light, and that he was not in any pain. Defendant resisted the efforts of the officers to extract him from his vehicle. After defendant was extracted, an ambulance transported him to the hospital, where a phlebotomist drew his blood. Defendant was "[v]ery combative" during the blood draw. His blood tested positive for marijuana and PCP.

Madison Ruano died from multiple injuries sustained during the collision. The first two vertebrae in her neck were fractured, causing her spinal cord to be severed from her brain. Madison's mother, Tina Ruano, was also seriously injured.

The prosecution offered the testimony of two expert witnesses concerning the effects of PCP on a user's mental state. David Vidal, a retired senior

3

criminalist with the Los Angeles County Sheriff's Department, testified that PCP affects a person's "ability to process data from multiple sources," and it disrupts time and distance perception. California Highway Patrol Officer Joshua Wupperfeld testified that people under the influence of PCP are capable of making decisions, but they are more likely to make bad decisions.

The prosecution also read into the record portions of defendant's testimony from his first trial. In that testimony, defendant admitted he was the driver of the black Toyota and that he was responsible for the collision. Defendant also admitted a "wet reckless" conviction in 1995 (Veh. Code, §§ 23103, 23103.5), at which time he attended a three-month educational program. In addition, he admitted a driving under the influence conviction in 2001 (Veh. Code, § 23152, subd. (b)), at which time he attended an 18-month educational program. As part of these educational programs, defendant was informed of the dangers of driving while intoxicated, and he watched graphic videos depicting people who had been injured or killed by impaired drivers.

Defendant further testified that in 2011 and 2012 he had used PCP about 10 to 15 times. On October 30, 2011, he was hospitalized for a day because of PCP use, and on November 8, 2011, he was arrested for being under the influence of PCP. Defendant also described the events of December 6, 2012, the day of the collision that killed Madison Ruano. Defendant smoked marijuana mixed with PCP. He then fell asleep, waking at about 3:30 or 4:00 in the afternoon. Defendant admitted that he next "made a conscious decision to go and retrieve [his] keys, to go and drive the car." He also admitted that he knew what could happen when a person drove while under the influence. He knew that lives might be lost and that families might be destroyed.

In addition to this transcribed testimony from defendant's first trial, defendant also gave live testimony at his second trial. He said that on the day of

4

the collision, he smoked marijuana mixed with PCP and had a bad reaction to the PCP. He heard loud voices and felt as if he were being "compressed." He went to sleep and slept until about 4:00 p.m. The bad reaction continued, and defendant decided to drive to his son's house. He testified that his next memory was waking up in county jail the following day. He said that he did not remember starting his car, driving, being involved in a collision, being transported in an ambulance, having a blood draw at the hospital, being booked into jail, or being interviewed at the police station. Concerning his general awareness of the dangers of driving while intoxicated, defendant testified that he did not "process everything [he] had learned in the past" or weigh "the good and the bad" when he entered his car to drive to his son's house.

Relying on *People v. Batchelor* (2014) 229 Cal.App.4th 1102 (*Batchelor*), the defense requested that the second jury be instructed that defendant had previously been convicted of gross vehicular manslaughter in connection with the collision that killed Madison Ruano, thus making clear to the jury that, regardless of its verdict on the murder charge, defendant would be held accountable for his manifestly wrongful conduct. The trial court concluded, however, that *Batchelor* was distinguishable. It declined to give the requested instruction, and the jury found defendant guilty of second degree murder.

Defendant appealed, and the Court of Appeal affirmed, expressly disagreeing with the holding of *Batchelor*.

We granted review.

### DISCUSSION

This case requires us to revisit the distinction between necessarily included offenses and lesser related offenses, a distinction we discussed in *People v. Birks* (1998) 19 Cal.4th 108 (*Birks*). "Under California law, a lesser offense is necessarily included in a greater offense if either the statutory elements of the

5

greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*Birks*, at p. 117.) If a lesser offense shares some common elements with the greater offense, or if it arises out of the same criminal course of conduct as the greater offense, but it has one or more elements that are not elements of the greater offense as alleged, then it is a lesser related offense, not a necessarily included offense. (See *id.* at pp. 119–120.)

In this case, if the first jury had convicted defendant of an offense that was necessarily included within the charge of murder, instead of a lesser related offense to murder, retrial of the murder charge would have been barred. Although a jury's inability to reach a verdict is a well-established exception to the double jeopardy bar (see *People v. Fields* (1996) 13 Cal.4th 289, 299–300 (*Fields*)), and although there is no implied acquittal when a deadlocked jury convicts on a necessarily included offense (*id.* at pp. 301–305), retrial of a greater offense after a defendant has been convicted of a necessarily included offense would be tantamount to trying the defendant on the necessarily included offense twice, and a conviction on the greater offense under such circumstances would be tantamount to convicting the defendant on the necessarily included offense twice. Therefore, we held in *Fields* that if a jury fails to reach a verdict on a charged offense but convicts on a necessarily included offense, and if the conviction is recorded by the court and the jury is discharged, retrial of the greater offense is barred under Penal Code section 1023. (*Fields*, at pp. 310–311; see *People v. Greer* (1947) 30 Cal.2d 589.)

Here, however, retrial of the murder charge was permitted because the first jury, unable to agree as to the murder charge, convicted defendant of *lesser related* offenses, but it did not convict him of any *necessarily included* offenses. Of these lesser related offenses, the one that was factually closest to the murder charge was

6

gross vehicular manslaughter while intoxicated, but because defendant's gross vehicular manslaughter conviction required proof of elements that did not need to be proved to convict defendant of murder,[1] the retrial of the murder charge did not constitute a second trial of the gross vehicular manslaughter charge, and the conviction on the murder charge did not constitute a second gross vehicular manslaughter conviction.

Defendant argues, however, that it was unfair to him that the retrial jury faced what appeared to it to be an all-or-nothing choice between conviction and complete exoneration. In other words, because the retrial jury was only presented with the murder charge, and because the trial court declined to inform the jury of the gross vehicular manslaughter conviction, the retrial jury was led to believe, defendant argues, that it had to convict him of murder to ensure that he would face some punishment for his manifestly wrongful actions.

Defendant relies on cases in which we have discussed the trial court's sua sponte obligation to give instructions on offenses that are necessarily included within a charged offense. We have said that such instructions "encourag[e] the most accurate verdict permitted by the pleadings and the evidence." (*Birks*, *supra*, 19 Cal.4th at p. 112; see *People v. Breverman* (1998) 19 Cal.4th 142, 161 (*Breverman*).) Moreover, we have said that a rule requiring such instructions "ensures that the jury will be exposed to the full range of verdict options which . . . are presented in *the accusatory pleading itself* and are thus closely and openly

---

[1] "Gross vehicular manslaughter while intoxicated requires proof of elements that need not be proved when the charge is murder, namely, use of a vehicle and intoxication. Specifically, [Penal Code] section 191.5 requires proof that the homicide was committed 'in the driving of a vehicle' and that the driving was in violation of specified Vehicle Code provisions prohibiting driving while intoxicated." (*People v. Sanchez* (2001) 24 Cal.4th 983, 989.)

7

connected to the case. In this context, the rule prevents either party, whether by design or inadvertence, from forcing an all-or-nothing choice between conviction of the stated offense on the one hand, or complete acquittal on the other. Hence, the rule encourages a verdict, within the charge chosen by the prosecution, that is neither 'harsher [n]or more lenient than the evidence merits.' " (*Birks*, at p. 119; see *Breverman*, at p. 155; *People v. Barton* (1995) 12 Cal.4th 186, 196.) In this connection, we have also emphasized that " '[o]ur courts are not gambling halls but forums for the discovery of truth' " (*Barton*, at p. 196, quoting *People v. St. Martin* (1970) 1 Cal.3d 524), implying that an all-or-nothing choice encourages a high-risk, high-reward gambler's approach to criminal justice.

Defendant argues that these same principles and policies apply here where the context is a retrial after a deadlock on a greater offense and a conviction on lesser related offenses. Defendant contends that informing the retrial jury of his previous gross vehicular manslaughter conviction will ensure that the jury is not misled into believing it faces an all-or-nothing choice between a murder conviction and a complete exoneration. Defendant concedes that the gross vehicular manslaughter conviction is a *lesser related* offense to murder, whereas all the cases he relies on involved *necessarily included* offenses. He also concedes that this court held in *Birks* that trial courts should deny a defense request for instructions on uncharged lesser related offenses. (*Birks*, *supra*, 19 Cal.4th at pp. 112–113, 137.) But defendant concludes that as to the latter point, *Birks* is distinguishable.

We reasoned in *Birks* that granting a defense request for instructions on uncharged lesser related offenses would interfere with prosecutorial charging discretion, essentially allowing the defendant, not the prosecutor, to choose which charges are presented to the jury for decision, thus forcing the prosecution not only to prove the charged offenses but also to disprove any uncharged lesser related

8

offenses that the defense might propose as an alternative. (*Birks*, *supra*, 19 Cal.4th at pp. 113, 129–130.) In other words, *Birks* makes clear that the goal of enabling a jury to return the most accurate verdict that the evidence supports does not require that every possible crime a defendant may have committed be presented to the jury as an alternative. Rather, a jury need only be instructed on offenses that the prosecution actually charged either explicitly or implicitly (because they were necessarily included within explicitly charged offenses).

Here, defendant acknowledges this court's reasoning in *Birks*, but he argues that in a case like his, involving retrial of a greater offense after a conviction on a lesser related offense, the prosecution *in fact charged the lesser related offense*, and therefore the concern we had in *Birks* about interfering with prosecutorial charging discretion is not implicated. In such a case, defendant argues, the controlling principle should be that of obtaining the most accurate verdict supported by the evidence, and therefore the retrial jury should be informed of lesser related offenses that resulted in convictions during previous proceedings. Doing so, defendant argues, would avoid giving the retrial jury the false impression of an all-or-nothing choice.

We are not persuaded by defendant's argument.

At the outset, we note that Penal Code sections 1093 and 1127 authorize a trial court to instruct the jury on the law that applies to the issue it is deciding, but the trial court may not, generally speaking, instruct the jury on questions of fact. Penal Code section 1093, subdivision (f), provides in relevant part: "The judge may . . . charge the jury, and shall do so on any points of law pertinent to the issue, if requested by either party; and the judge may . . . declare the law." Similarly, Penal Code section 1127 provides in relevant part: "In charging the jury the court may instruct the jury regarding the law applicable to the facts of the case . . . . Either party may present to the court any written charge on the law, *but not with*

9

*respect to matters of fact*, and request that it be given. If the court thinks it correct and pertinent, it must be given; if not, it must be refused." (Italics added.) It is not clear that the instruction defendant requested is authorized by these provisions. He requested that the jury be instructed about the *fact* that a previous jury had convicted him of gross vehicular manslaughter in connection with evidence before the jury. Sections 1093 and 1127 do not expressly authorize a trial court, as part of its power to instruct on the law, to inform the jury of the fact of a previous conviction, and section 1127 might be read as barring the court from doing so. In some circumstances, however, a trial court may instruct the jury on an uncontested fact. (See, e.g., *Edmonds v. Wilcox* (1918) 178 Cal. 222, 223–224; *Moore v. Pacific Coast Steel Co.* (1915) 171 Cal. 489, 491.) We need not decide whether defendant's requested instruction is authorized by sections 1093 and 1127, or falls within the trial court's inherent authority, because we conclude that the instruction was unnecessary, and the instruction we approve in its place is an instruction on the law, and hence expressly authorized by sections 1093 and 1127.

At the heart of this case is the risk that a retrial jury asked to resolve a single charge will let considerations of punishment enter into its deliberations. (*People v. Nichols* (1997) 54 Cal.App.4th 21, 24; *People v. Holt* (1984) 37 Cal.3d 436, 458 ["A defendant's possible punishment is not a proper matter for jury consideration."]; CALCRIM Nos. 101, 3550 ["You must reach your verdict without any consideration of punishment."].) But this risk can cut both ways. Defendant is obviously disadvantaged if the retrial jury believes it is faced with an all-or-nothing choice and convicts him of murder rather than have him go unpunished. Conversely, the People are disadvantaged if the jury is told that the defendant has already been convicted of a serious homicide offense and then speculates about why, if that is so, the murder charge is being retried, or about the punishment defendant will face with or without an additional murder

10

conviction. (See *People v. Alexander* (2010) 49 Cal.4th 846, 920 [" 'The trial court has the duty . . . "to refrain from instructing on principles of law which not only are irrelevant to the issues raised by the evidence but also have the effect of confusing the jury or relieving it from making findings on relevant issues." ' "]; cf. *Fields*, *supra*, 13 Cal.4th at p. 307, fn. 5 [if retrial of a greater offense were permitted after conviction on a necessarily included offense, and if the new jury were told of the former conviction, "there exists the potential for juror confusion and/or speculation"].)

Here, the instruction defendant requested did not even-handedly address the possibility that the jury's attention might be diverted from the issue before it — guilt or innocence of the charged offense — to the question of punishment, a question that is not for the jury to decide. Moreover, defendant's concern that his retrial jury should not have been given the false impression of an all-or-nothing choice could have been adequately addressed by the instruction set forth at the beginning of this opinion. Specifically, the trial court could have informed the retrial jury that cases are sometimes tried in segments, and it could have clarified the question at issue in the segment then before the jury, admonishing the jurors not to consider punishment or the possibility that defendant might be held criminally responsible in some other segment of the proceedings. Such an instruction would have prevented the retrial jury from wrongly assuming that an acquittal on the murder charge would mean defendant escaped criminal liability altogether, and it would have done so without unnecessarily confusing the jury or focusing its attention on extraneous matters.[2]

---

[2]    The dissent says: "[T]here is no reason why trial courts, in giving the instruction set forth in today's opinion, could not add the following sentence: 'You are not to assume that an acquittal on the murder charge would result in the

*(footnote continued on next page)*

11

Defendant relies on *Batchelor*, *supra*, 229 Cal.App.4th 1102. In *Batchelor*, as here, a jury convicted the defendant of gross vehicular manslaughter while intoxicated, but it failed to reach a verdict on a charge of murder. As here, the trial court denied the defendant's request that the retrial jury be informed of the gross vehicular manslaughter conviction. The prosecutor then implied in argument to the retrial jury that an acquittal would mean the defendant went unpunished. Specifically, the prosecutor said: " 'And *now is the time* that you have to hold this person accountable. *Now is the time* that you have to send the message that you drink and drive and kill someone, you're going to be held accountable. There is only one count in this case that you have to decide on. This is it. *Hold him accountable for killing someone.*' " (*Batchelor*, at p. 1117, italics added.) In other words, the prosecutor led the jury to believe that convicting the defendant of murder was the only opportunity to hold him accountable for his actions.

The appellate court in *Batchelor* reversed the defendant's murder conviction and remanded for a new trial. The court held that the trial court had erred by instructing the jury in a manner that gave the false impression of an all-or-nothing choice, and the court added that the prosecutor's misleading argument had compounded the error. (*Batchelor*, *supra*, 229 Cal.App.4th at pp. 1116–1117.) The court also suggested that the best solution on remand was for the trial court to inform the retrial jury that the defendant had previously been convicted of

---

*(footnote continued from previous page)*

defendant escaping criminal liability altogether, nor are you to consider whether a conviction would result in the defendant receiving excessive punishment.' " (Dis. opn. of Liu, J., *post*, at p. 4.) The added sentence is, however, unnecessary. The instruction we approve today already makes the same point, and it does so without repeatedly focusing on the question of punishment: the very topic the jury is not to consider.

gross vehicular manslaughter.  (*Id*. at p. 1117.)  For reasons already discussed, we disagree that a retrial jury should be so informed.  The only reason the *Batchelor* court gave for informing the retrial jury of the previous conviction was its concern that the jury should not be given the false impression of an all-or-nothing choice.  (*Ibid.*)  But the instruction we approve today would have been adequate to dispel that false impression, and it would have done so without confusing the retrial jury with extraneous information.

In *People v. Johnson* (2016) 6 Cal.App.5th 505 (*Johnson*), the Court of Appeal reaffirmed its holding in *Batchelor*, and it went further.  *Johnson* was factually similar to both *Batchelor* and this case — a retrial after a jury hung on second degree murder but convicted of gross vehicular manslaughter while intoxicated.  But in *Johnson*, the trial court informed the prospective jurors during voir dire for the retrial that there had been a previous trial arising from the same underlying facts, that the defendant had been convicted of " 'two of the three charges brought by the district attorney' " (*Johnson*, at p. 510), and that the jury's task would be to " 'address the one count that was left unresolved in the first trial' " (*ibid*.).  The Court of Appeal concluded that those comments were insufficient to dispel the false impression of an all-or-nothing choice between a murder conviction and a complete exoneration.  (*Ibid*.)  The court held that despite the trial court's detailed description of the context of the proceeding then before the jury, and despite the fact that the prosecutor did not mislead the jury about the effect of an acquittal, the trial court nonetheless erred by not informing the jury of the previous gross vehicular manslaughter conviction.  (*Id*. at pp. 510–511.)  The court reasoned that "[t]he defense was . . . placed in a substantially weaker rhetorical position in the retrial," because counsel could not ask the jury to convict the defendant of gross vehicular manslaughter instead of murder, and because

13

counsel could not tell the jury that defendant had been so convicted. (*Id*. at p. 511.)

We think the information the trial court gave the prospective jurors in *Johnson*, informing them that the defendant had previously been convicted of " 'two of the three charges' " (*Johnson*, *supra*, 6 Cal.App.5th at p. 510), was sufficient to dispel the false impression of an all-or-nothing choice, and it avoided any disadvantage to the defendant from being unable to urge a vehicular manslaughter conviction. Therefore, we disagree with the *Johnson* Court of Appeal that the trial court in that case needed to inform the jury specifically of the previous gross vehicular manslaughter conviction.[3]

Defendant further argues that a rule requiring the trial court, upon request, to inform a retrial jury of the specifics of previous convictions on lesser related offenses would be analogous to the well-settled rule requiring the trial court, upon request and when relevant, to inform the jury that a verdict of not guilty by reason of insanity (NGI) will not result in the defendant going free. (See *People v. Coddington* (2000) 23 Cal.4th 529, 625–626; *People v. Kelly* (1992) 1 Cal.4th 495, 538; *People v. Moore* (1985) 166 Cal.App.3d 540, 556; CALCRIM No. 3450.) The analogy to NGI cases is to a certain extent an apt one. There, as here, the concern is that a jury, although instructed not to consider punishment, might nonetheless have the consequences of its verdict in mind, and it might decide against returning an NGI verdict because it imagines that the defendant, who has done a manifestly wrongful act, will go free. The NGI instruction ensures that the jury does not make that mistake, and thus it ensures a more accurate verdict.

---

[3]     Insofar as the reasoning of either *People v. Batchelor*, *supra*, 229 Cal.App.4th 1102 or *People v. Johnson*, *supra*, 6 Cal.App.5th 505 is inconsistent with the views expressed herein, we disapprove those decisions.

Likewise, the instruction we approve today ensures that retrial juries do not wrongly assume that they are presented with an all-or-nothing choice between conviction and complete exoneration, and it finds support in the NGI cases. But defendant draws too strong a conclusion from the NGI analogy. The instruction we approve today is adequate to dispel any incorrect assumption that the retrial jury might make, and therefore there is no need for the trial court to inform the jury of the specific convictions a defendant has already suffered in connection with the facts presented at the retrial. To that extent, the analogy defendant draws to the NGI cases is a false one.

Here, the defense requested a specific instruction informing the jury of his gross vehicular manslaughter conviction, and the trial court refused such an instruction, stating that it was "going to preclude any reference to the prior trial, or the prior verdict." In light of the court's broad statement, defendant cannot be faulted for failing to request an instruction like the one we approve today, and therefore, we must consider the question of prejudice.

First, we conclude that the *Watson* prejudice standard applicable to state law error applies in this context. (*People v. Watson* (1956) 46 Cal.2d 818, 836.) In a noncapital case, the trial court's failure to instruct on *necessarily included* offenses is reviewed for prejudice under the *Watson* standard. (See *Breverman*, *supra*, 19 Cal.4th 142, 164–178.) Here, defendant is arguing that the trial court failed to instruct on *lesser related* offenses, and it follows from the logic of our analysis in *Breverman* that such an error should likewise be reviewed for prejudice under the *Watson* standard. Accordingly, in evaluating prejudice, the relevant inquiry is whether it is "reasonably probable" defendant would have obtained a more favorable result had the trial court given the instruction we approve today. (*Watson*, at p. 836.) We conclude that it is not.

15

By defendant's own admission, he drove at 80 miles per hour through a red light in a densely populated urban area during the weekday rush hour. Doing so can be likened to shooting a gun into a crowd; it is manifestly an act dangerous to human life. Thus, the only real issue was whether defendant acted intentionally, knowing the danger and consciously disregarding it. (See, e.g., *People v. Landry* (2016) 2 Cal.5th 52; *People v. Swain* (1996) 12 Cal.4th 593, 601–603.) We need not reiterate here all the evidence presented to the retrial jury, but it is particularly significant that during the chase preceding the fatal collision, defendant ignored both red lights and the sirens of pursuing law enforcement officers, and he also nearly hit several vehicles. Those are events that would tend to put a person on notice that he or she is driving in a dangerous manner, and there is no reason to conclude that they did not put defendant on such notice.

Significantly, consistent with CALJIC No. 4.20, the jury here was instructed that defendant's voluntary intoxication was not a defense. Likewise, defense counsel did not rely on defendant's intoxication, and the prosecution argued to the jury, without objection, that intoxication was not a defense. There is no reason why any of those circumstances would have changed if the trial court had given the jury the instruction we approve today, an instruction that has nothing to do with intoxication evidence. Accordingly, in assessing prejudice, we consider only the evidence and theories actually presented to the jury, and there is no reasonable probability that the jury would have used the fact of defendant's voluntary intoxication to conclude that he did not act intentionally, did not know of the danger he was creating by his actions, or did not consciously disregard that danger.

Moreover, defendant's admissions and also his actions immediately before and after the fatal collision strongly support the conclusion that he was fully capable of acting intentionally and, in fact, did so. Defendant testified that he

16

"made a conscious decision to go and retrieve [his] keys, to go and drive the car," and he did so despite a general awareness that lives might be lost if a person drives while intoxicated.  Defendant then proceeded to drive in a manner that, although erratic and dangerous, demonstrated clear intentionality.  For example, after coming to a temporary halt at the curb, defendant was approached by a sheriff's deputy, and he acknowledged the presence of the deputy before speeding away.[4] And after the collision, when sheriff's deputies approached defendant's vehicle, they found him alert and oriented, despite signs of intoxication.  He was aware that he had been in a collision, that he was wearing a seatbelt, that he had run a red light, and that he was not in any pain.  That fact that he was aware, immediately after the collision, that he had run a red light is particularly noteworthy; it strongly supports the conclusion that defendant acted knowingly and with conscious

---

[4]     The dissent argues that defendant lacked the ability to act with intention because he was hanging his body halfway out of the car window, screaming, talking to himself, reaching in the air, and seemed oblivious to the presence of law enforcement officers.  (Dis. opn. of Liu, J., *post*, at p. 5.)  The dissent also draws a distinction between evidence of defendant's intoxication and evidence of defendant's behavior, arguing that his behavior, without reference to its cause, is relevant to show his mental state.  (*Id*. at p. 6.)  The behavior that the dissent identifies suggests a certain cavalier exuberance, but it does not, in itself, prove that defendant was unable to act with intention, and in the context of this case, it can support such an inference only if the dissent's theory is that it indicates intoxication.  Thus, the dissent's distinction between intoxication evidence and behavior evidence does not withstand scrutiny.  Defendant did not argue intoxication as a defense, nor did he argue that his exuberant behavior, irrespective of his intoxication, indicated an inability to act intentionally.  The jury was instructed not to consider voluntary intoxication as a defense, and the prosecution highlighted that point during closing argument, without objection.  Under those circumstances, there is simply no reasonable probability that the jury would have relied on defendant's behavior and admitted intoxication as a reason to reject a finding of implied malice.

17

disregard of any danger.[5]  Defendant also actively resisted the officers who extracted him from his vehicle and the medical personnel who drew his blood, again proving his ability to make decisions (albeit poor ones) and to act with intentionality.

And defendant was also fully informed of the dangers of driving while intoxicated.  He had previously suffered convictions for alcohol-related reckless driving (Veh. Code, §§ 23103, 23103.5) and driving under the influence of drugs or alcohol (Veh. Code, § 23152, subd. (b)), and after both convictions, he had attended educational programs related to the dangers of driving while intoxicated.  In connection with these programs, defendant had also watched graphic videos depicting actual traffic collisions caused by impaired drivers.  In addition,

---

[5]  The dissent attempts to show that the evidence that defendant was alert and oriented immediately after the collision was equivocal.  (Dis. opn. of Liu, J., *post*, at pp. 5–6.)  It was not.  When the emergency medical technician arrived on the scene, he assessed defendant's mental state using the Glasgow Coma Scale, which tests eye, verbal, and motor responses.  Defendant had a perfect score, indicating a "normal level of consciousness."  Next, in accordance with county protocol, a paramedic assessed whether defendant was "alert and oriented," meaning that defendant was asked four questions (his name, location, activity, and a simple question like, "Who's the President?").  Defendant was able to answer the questions correctly, receiving the highest score.  And, as noted, defendant knew that he was wearing a seatbelt, that he had run a red light, and that he was not in pain.  To undermine this evidence, the dissent points out that, 15 minutes later, when defendant was riding in the ambulance, he claimed not to remember what had happened and he wanted to know why he was in the ambulance.  It was the technician's impression at the time that defendant was malingering, but even if defendant had in fact lost his memory during the intervening 15 minutes, that fact is irrelevant.  What is relevant is that immediately after the collision, defendant was "alert and oriented" and knew he had run a red light, which strongly suggests that he knew what he was doing *when he was doing it*.  The dissent also notes that after the collision, defendant exhibited the typical behavior of someone under the influence of PCP, including a blank stare and emotional volatility.  Again, the dissent does not seem to appreciate that the jury was instructed not to consider evidence of voluntary intoxication as a defense.

18

defendant signed a driver's license form, certifying: "If I drive while under the influence of alcohol or drugs or both and as a result, a person is killed, I can be charged with murder." Defendant also conceded in his testimony that he knew the risks associated with impaired driving. The only evidence he offered that tended to negate implied malice was his testimony that he did not "process everything [he] had learned in the past" or weigh "the good and the bad" when he decided to drive on the day of the collision, and that he had no recollection of events from the time he entered the black Toyota to the time he woke up in jail. But this self-serving testimony stands in contrast to the evidence that immediately after the collision, defendant *knew* he had just run a red light. The test for implied malice is whether a defendant had the required mental state *at the time of his or her actions*, which defendant clearly did; it does not matter if he later forgot it all.

Furthermore, there is no indication that the jury was concerned about an all-or-nothing verdict, or that it wondered about other possible offenses defendant might have committed. During deliberations, the jury asked the court for definitions of "conscious disregard and knowledge." That question indicates that the jury's focus was on defendant's mental state, the only real factual issue in the case. Thus, nothing suggests that the jury was concerned about anything other than the evidence as it related to the charge it was asked to resolve.

Finally, although defense counsel was not able to point out in argument to the jury that defendant had previously been convicted of gross vehicular manslaughter in connection with the evidence presented at trial, counsel was permitted to argue (and did argue) that defendant was guilty of lesser offenses than murder, and that it was specifically the murder charge that went too far. Thus, counsel told the jury: "There are probably 30 other charges I could think of and I would have nothing to say. I would stand here and say he is absolutely guilty of it. [¶] But murder, ladies and gentlemen, there is a dispute here." That argument

19

tended to minimize any disadvantage counsel faced as a result of the trial court's failure to give the instruction we approve today.[6]

In summary, we see no basis for finding prejudice. The evidence was overwhelming both as to the objective dangerousness of defendant's behavior and as to his mental state. Defendant acted with complete disregard for human life, and he did so in an alert state of mind. He admitted a general awareness that his actions were dangerous. Moreover, he demonstrated, while driving, his ability to make intentional decisions, and his comments immediately after the fatal collision indicated his full awareness of the intentional decisions he had just made, including driving through a red light. It is therefore not "reasonably probable" (*Watson*, *supra*, 46 Cal.2d at p. 836) that the jury would have reached a different verdict if it had been instructed in the manner we approve today.

---

[6] Before closing arguments, the trial court spoke with defense counsel concerning counsel's argument. The court said: "[A] passing reference . . . to, [']There may be other charges that they might have proven but they are not charged here, this is the only one you have to concern yourself with'; *I don't have an issue with that*." (Italics added.) In other words, the court expressly permitted defense counsel to tell the jury essentially what the instruction we approve today would have told the jury, namely, that the prosecution "might have proven" "other charges" in a separate proceeding, but those other charges "are not charged here," and the jurors need not be "concern[ed]" with them. Counsel did not think these specific points were so important that he needed to convey them to the jury. Nonetheless, the dissent is now arguing that it was prejudicial error for the trial court not to have conveyed to the jury essentially the same points.

**CONCLUSION**

The judgment of the Court of Appeal is affirmed.

**CHIN, J.**

**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**CORRIGAN, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**MOORE, J.***

_____

\*    Associate Justice of the Court of Appeal, Fourth Appellate District, Division Three, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21

**DISSENTING OPINION BY LIU, J.**

The court recognizes that an important concern in this case is to "prevent the [retrial] jury from wrongly assuming that an acquittal on the murder charge would result in the defendant escaping criminal liability altogether." (Maj. opn., *ante*, at pp. 1–2.) Yet today's opinion holds that the trial court, in addressing this concern, would have erred if it had informed the retrial jury that a previous jury had convicted defendant Marvin Travon Hicks of gross vehicular manslaughter. (*Id.* at p. 1.) I respectfully disagree. Upon Hicks's request, the trial court should have informed the jury that he had already been convicted of gross vehicular manslaughter. Further, the trial court's error in instructing the jury was prejudicial in light of the evidence in this case.

## I.

In assessing the merits of Hicks's requested instruction, today's opinion is correct that "[d]efendant is obviously disadvantaged if the retrial jury believes it is faced with an all-or-nothing choice and convicts him of murder rather than have him go unpunished." (Maj. opn., *ante*, at p. 10.) But the court further states that "the People are disadvantaged if the jury is told that the defendant has already been convicted of a serious homicide offense and then speculates about why, if that is so, the murder charge is being retried, or about the punishment defendant will face with or without an additional murder conviction." (*Id.* at pp. 10–11.) Of course, if the jury had been told of Hicks's prior conviction, the prosecution may

1

have been "disadvantaged" compared to a scenario in which the jury had not been told. (*Id.* at p. 10) But that is not the relevant comparison.

Fairness to the parties means they should have been put, to the extent possible, in the same position at the retrial as at the first trial. Not telling the retrial jury of Hicks's prior conviction may have led that jury to believe it faced an all-or-nothing choice that the first jury clearly did not face. This significantly altered the complexion of the case for Hicks from the first trial to the second trial. By contrast, it is not clear that telling the retrial jury of Hicks's prior conviction would have resulted in such a significant change for the prosecution from the first trial to the second. True, telling the retrial jury of Hicks's prior conviction would have conveyed certainty as to whether he would be punished, a certainty not present in the first trial. But once the first jury had decided that Hicks was guilty of gross vehicular manslaughter, the first jury — like a retrial jury told of Hicks's prior conviction — may have "speculate[d] about why . . . the murder charge [was] being [pursued], or about the punishment defendant [would] face with or without an additional murder conviction." (Maj. opn., *ante*, at pp. 10–11.)

The trial court's refusal to give Hicks's requested instruction disadvantaged the defense to a greater extent than the court acknowledges. In the first trial, Hicks essentially conceded the elements of gross vehicular manslaughter in an effort to avoid conviction on the murder charge. The prosecution then used Hicks's admissions and stipulations to its advantage in the retrial, while Hicks could not. The prosecution opened the retrial by reading back portions of the transcript in Hicks's first trial: "His words, not mine. His words . . . . 'I'm responsible. I was the driver.' These are words from Mr. Hicks at a prior proceeding." Hicks, by contrast, could no longer pursue a strategy of conceding a lesser offense in order to avoid conviction on the greater offense. Instead, defense counsel could only say: "There are probably 30 other charges I could think of and

2

I would have nothing to say.  I would stand here and say he is absolutely guilty of it.  I could stand here and think of charges involving killing that don't rise to the level of murder and I would stand here and say he is absolutely guilty of it.  [¶]  But murder, ladies and gentlemen, there is a dispute here."  (In light of this statement, it is untrue that defense counsel "did not think [the possibility of other charges was] so important that he needed to convey them to the jury."  (Maj. opn., *ante*, at p. 20, fn. 6).)  Unlike the prosecution, which enjoyed the advantage of using Hicks's prior admissions at the retrial, Hicks suffered the disadvantage of having no means to bring his admissions to bear on his trial strategy, as he did at the first trial.

The instruction Hicks requested will not always be advantageous to a defendant facing a retrial on a greater charge.  The instruction may ease the prosecution's burden of proof, and it may encourage a jury that is not concerned about "over-punishment" to convict on the greater charge.  It is not difficult to imagine why a defendant might opt not to request the instruction.  But in cases such as this one, where the defendant concedes elements of a lesser charge at the first trial in order to avoid conviction on a greater charge, the parties' positions at the retrial will more closely approximate their positions at the first trial if the court gives the instruction than if it does not.  Here, the trial court should have given the instruction upon Hicks's request.

Today's opinion mentions Penal Code sections 1093 and 1127 but reaches no conclusion as to whether they prohibit a trial court from giving the kind of instruction Hicks requested.  (Maj. opn., *ante*, at pp. 9–10.)  It is doubtful these statutes present any obstacle here; both statutes authorize a trial court to "make such comment on the evidence . . . as in his or her opinion is necessary for the proper determination of the case."  (Pen. Code, § 1093, subd. (f); see *id.*, § 1127.)  This language appears broad enough to permit a trial court, in the circumstances

3

here, to inform the jury that the evidence resulted in a prior conviction on a related offense. The Attorney General does not rely on these statutes, and neither does today's opinion.

Instead of permitting an instruction that forthrightly informs the jury of a prior conviction and admonishes the jury to disregard it, today's opinion authorizes an instruction that says: "Nor are you to speculate about whether the defendant may have been, or may be, held criminally responsible for his conduct in some other segment of the proceedings." (Maj. opn., *ante*, at p. 1.) One might wonder whether telling the jury not to speculate about what "may have" happened or what "may" happen in the future is prone to encourage precisely such speculation. But if we presume the jury can follow that instruction, then there is no reason why the jury could not also follow an instruction that identifies the prior conviction, *thereby eliminating speculation*, and admonishes the jury to disregard the prior conviction in deciding the defendant's guilt or innocence on the current charge.

At the very least, there is no reason why trial courts, in giving the instruction set forth in today's opinion, could not add the following sentence: "You are not to assume that an acquittal on the murder charge would result in the defendant escaping criminal liability altogether, nor are you to consider whether a conviction would result in the defendant receiving excessive punishment." This sentence, the first part of which is taken virtually verbatim from the court's opinion (see maj. opn., *ante*, at pp. 1–2, 11), simply makes explicit what the court says is the intended message of its formulated instruction.

## II.

Even assuming that the limited instruction set forth in today's opinion was all that the trial court should have given in this case, I disagree with the court's

conclusion that there is no reasonable probability Hicks would have obtained a more favorable result had the trial court given the instruction.

The evidence of implied malice required for second degree murder is closer in this case than the court suggests. Before the collision, Hicks lost traction and came to a temporary halt. Today's opinion notes that Hicks acknowledged the presence of a sheriff's deputy at that time before speeding away, thereby suggesting that Hicks was capable of acting with intention. (Maj. opn., *ante*, at pp. 16–17.) However, the evidence also indicates that during this stop Hicks was hanging halfway out of the driver's window, jerking and flopping around, screaming and mumbling incomprehensibly, and looking around and reaching out "like he was trying to grab stuff in the air." Although several deputies ordered Hicks to put his hands up, Hicks did not comply. At times, he seemed oblivious to the deputies' presence altogether.

Today's opinion suggests that Hicks was alert and oriented after the collision, and that he was aware he had run a red light. (Maj. opn., *ante*, at pp. 3, 16–18.) This conclusion is based on the testimony of an emergency medical technician who indicated that Hicks was able to recall his name, location, and the time of day within minutes of the collision. But the same technician also testified that Hicks "didn't know what was going on" during the ambulance ride to the hospital and that Hicks kept asking why he was there and what was going on for the entire ride. The technician further testified that Hicks was unable to recount any details of the collision when asked, including whether he had been wearing a seatbelt or had run a red light. Moreover, a sheriff's deputy testified that Hicks was unresponsive for up to a minute after the collision and that Hicks had a blank stare on his face and lacerations on his head. According to the deputy, Hicks was "in his own world" and was "looking through" the deputies immediately after the collision, alternating between being angry and smiling, and not seeming to

5

understand he had been in a collision and needed to be taken to a hospital. This evidence casts doubt on whether Hicks had the requisite intent or was sufficiently aware of his behavior and its potential consequences to support an implied malice finding.

The court says this evidence of Hicks's behavior can support an inference that he was unable to act with intention "only if the dissent's theory is that it indicates intoxication." (Maj. opn., *ante*, at p. 17, fn. 4.) I do not see why that is so. Hicks did not argue voluntary intoxication as a defense at trial, and the jury was instructed not to consider voluntary intoxication as a defense. But separate and apart from the fact of Hicks's intoxication, both parties presented evidence of Hicks's behavior (whatever its cause) around the time of the collision because it is relevant to his mental state. The parties recognize the relevance of such evidence in their briefing, as does today's opinion in its reliance on Hicks's "actions immediately before and after the fatal collision" in assessing whether he acted intentionally. (*Id.* at p. 16.)

Given the closeness of the evidence, it is not surprising that the first jury deadlocked on the murder charge. (See *In re Richards* (2016) 63 Cal.4th 291, 320 (conc. opn. of Liu, J.) [citing cases recognizing that prior hung juries can be relevant to the determination of prejudice].) Notably, the prosecution did not present much in the way of new or different evidence at the retrial. Among the six new witnesses put forward by the prosecution, the Attorney General identifies only three who purportedly made the case stronger for the prosecution. The first testified that Hicks was alert and conscious after the collision, but uncontroverted testimony to that effect had already been given by another witness in the first trial. The second was a motorcyclist who testified that Hicks had yelled "[y]ou guys are stupid . . . [g]et out of my way" when he passed him prior to the collision; it is unclear how that is probative of implied malice. And the third witness provided

6

expert testimony that people under the influence of phencyclidine are capable of making decisions, although they may be poor ones. But testimony to this effect had been given by another expert at the first trial. In short, none of the new evidence was materially different or more probative as to the elements of second degree murder.

What *was* different between the first trial and the second was that the defense could no longer concede elements of gross vehicular manslaughter in the hope that the jury would convict him of that homicide charge and not murder. Defense counsel could only allude in the abstract to "30 other charges" (besides murder) that his client would "absolutely be guilty" of. And the trial judge admonished Hicks before he took the stand, warning him not to mention the prior trial, not to use the word "trial" when referring to his prior testimony, and not to talk about what he was convicted of or the fact that this was a retrial. On the other hand, the prosecutor could and did turn this restriction into an advantage. The prosecutor read back Hicks's admission of guilt that he was "responsible." And after confirming that Hicks believed people should be personally responsible for their actions, the prosecutor asked Hicks: "And you're saying to this jury that you should be personally accountable for the crash shown here in [this photograph]?" Hicks could only reply that he was responsible for the crash without explaining that he had been held accountable for it through a homicide conviction. In his closing statement, the prosecutor told the jury: "Remember, I talked to all of you in voir dire about the idea of personal accountability." He went on to state that each juror had confirmed he or she would be willing to hold a wrongdoer "personally accountable for what they've done." These statements may have led the jury to believe that only they could hold Hicks accountable for his actions.

On this record, it is reasonably probable that Hicks would have obtained a more favorable result if the jury had been informed of his prior manslaughter

7

conviction or even if the jury had been given the instruction set forth in today's opinion. Accordingly, Hicks's murder conviction should be vacated.

**LIU, J.**

8

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Hicks

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 243 Cal.App.4th 343
**Rehearing Granted**

_____

**Opinion No.** S232218
**Date Filed:** December 28, 2017

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Kathleen Blanchard

_____

**Counsel:**

Nancy Gaynor, under appointment by the Supreme Court, and Kim Malcheski, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Michael R. Johnsen, Deputy State Solicitor General, Paul M. Roadarmel, Jr., Steven E. Mercer, Stephanie A. Miyoshi and Esther P. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Nancy Gaynor
California Appellate Project
520 S. Grand Avenue, 4th Floor
Los Angeles, CA  90071
(213) 243-0300

Esther P. Kim
Deputy Attorney General
300 South Spring Street, Suite 1702
Los Angeles, CA  90013
(213) 897-2872