Filed 3/16/26  P. v. Herrera CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>　　Plaintiff and Respondent,<br><br>v.<br><br>ERNESTO NAVA HERRERA,<br><br>　　Defendant and Appellant. | 2d Crim. No. B337020<br>(Super. Ct. No. 21F-02028)<br>(San Luis Obispo County) |

      Ernesto Nava Herrera appeals his conviction, by jury, of the second degree murder of Jonathan Cruz, (Pen. Code, § 187, subd. (a)),[1] gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a)), driving under the influence of alcohol (Veh. Code, § 23153, subd. (a)), driving with a blood alcohol content of over .08% (Veh. Code, § 20001, subd. (b)), leaving the scene of an accident (Veh. Code, § 20001, subd. (a)), and driving with a suspended or revoked license.  (Veh. Code, § 14601.5, subd. (a).)

---

     [1] All statutory references are to the Penal Code unless otherwise stated.

The trial court sentenced appellant to a term of 15 years to life plus six years, eight months in state prison.  He contends the trial court erred because its instructions to the jury regarding implied malice murder did not require the jury to find the act he committed involved a high degree of probability that it would result in death.  He further contends his conviction of murder must be reversed because there is no substantial evidence that he acted with implied malice.  We affirm.

*Facts*

At about 11:00 p.m., appellant drove his Chevrolet Tahoe SUV the wrong way down the Tefft Street offramp onto the northbound 101 freeway in Nipomo.  He almost immediately collided with a smaller SUV being driven by Jose Cruz, causing Cruz's vehicle to roll over four or five times and eventually come to rest on its roof.  Cruz's 14-year-old son, Jonathan, had been wearing his seat belt and sitting in the back seat.  Jonathan died from injuries he received in the collision.  Cruz's wife, who had been sitting in the front passenger seat and also wearing a seat belt, broke four ribs and her clavicle and dislocated vertebrae in her neck.  Cruz himself sustained less serious injuries.

Appellant's vehicle came to a stop 50 to 75 yards to the south of the Cruz vehicle.  When it was discovered by CHP Officer Tyler Henry, the driver's side door was open and there was a small amount of blood on both the inside and outside of the door.  The driver's side air bag had deployed.  Damage to the front passenger side of the vehicle included a buckled hood and an intrusion into the engine compartment.

CHP officers found appellant about an hour later, with the help of a helicopter.  He was lying flat on the ground off the right-hand shoulder of the southbound freeway, about 1 mile

from the site of the collision. Appellant showed signs of intoxication and failed field sobriety tests. Nearly two hours after the collision, preliminary alcohol screening tests showed appellant had a blood alcohol content of .16 and .164. A blood draw taken almost two hours later showed appellant had a blood alcohol content of .157 percent.

The CHP officers communicated with appellant in Spanish. Appellant complied with their verbal orders and said he understood the field sobriety test instructions. He never said he did not speak Spanish or that he was a Mixteco speaker. The officers believed appellant spoke and understood Spanish.

While Officer Alex Banks investigated the collision, he noticed a trail of fluid leading away from the collision up the freeway offramp and onto Tefft Street. Banks also noticed that a puddle of fluid had formed on the street. He concluded it was possible that one of the vehicles in the freeway collision had been involved in another collision earlier that evening.

That same night, the owner of an agricultural property on Mehlschau Road in Nipomo noticed that a vehicle had crashed into a fence and some trees on his property, next to the road. Surveillance video showed five or six people helping to pull a truck away from the area of the damage and toward the road. The property owner gathered debris from the collision, including headlights and part of a bumper. A CHP officer later determined that the headlight was compatible with a Chevrolet Tahoe SUV.

Officer Banks learned about this incident the next day. He investigated the site and was able to follow a trail of fluid all the way from the site of the incident to the Tefft Street freeway offramp. In several locations, Officer Banks noticed

pools of fluid had formed, indicating the vehicle came to a stop there for at least some period of time.

Security video from a gas station near the freeway offramp shows a Chevrolet Tahoe SUV travel westbound on Tefft Street toward the freeway, stop and then make a lefthand turn onto the freeway offramp traveling in the wrong direction. The Tahoe then travels out of the frame of the video camera.

An inspection of the Tahoe after the collision showed spots of brown paint transfer on various parts of the front of the vehicle. This paint was consistent with the fence posts at the Mehlschau Road property. An invitation to a party on Mehlschau Road was found inside the Tahoe along with a bank deposit or money transfer slip with appellant's name on it. DMV records named appellant as the owner of the Tahoe. The vehicle had a fluid leak in an inlet line located just above the front bumper on the right side. This leak did not affect the functionality of the Tahoe and could have been caused during the collision on Mehlschau Road.

About four months before the collision with the Cruz vehicle, appellant was arrested for DUI. The record does not disclose whether appellant was prosecuted or convicted of any offense. In connection with that arrest, however, the arresting officer gave appellant the *Watson* advisement[2], in Spanish, that "'Driving under the influence [of alcohol] is extremely dangerous.' . . . 'If you continue to drive while under the influence of alcohol or drugs or a combination of both, and as a result of your driving or involvement in a crash and an accident and you kill somebody, you can be charged with murder.'" After receiving the

---

[2] *People v. Watson* (1981) 30 Cal.3d 290 (*Watson*).

4

advisement, appellant told the arresting officer that he understood.

*Contentions*

Appellant contends the trial court erred in its instructions to the jury because it did not inform the jury that, to support an implied malice murder conviction, appellant must have committed an act that involved a high degree of probability that it would result in death. He further contends there is no substantial evidence that he actually and subjectively appreciated the dangerousness of his act or that he acted with conscious disregard of that danger. In this regard, appellant contends the prior *Watson* advisement is not sufficient because it was given in Spanish and he is a native Mixteco speaker. Finally, appellant contends the cumulative effect of these errors was prejudicial.

*Standard of Review*

We review de novo the question whether the trial court erred in its instructions to the jury. (*People v. Parker* (2022) 13 Cal.5th 1, 66; *People v. Waidla* (2000) 22 Cal.4th 690, 733.) We review the question whether there is sufficient evidence appellant acted with implied malice under the familiar substantial evidence standard of review. This requires us to "'review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. . . .'" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87, quoting *People v. Zamudio* (2008) 43 Cal.4th 327, 357.) In doing so, we "'review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. . . .'" (*Ibid.*)

*Discussion*

Instructional Error. The trial court instructed the jury in terms of CALCRIM No. 520, that murder requires the People to prove: "1. The defendant committed an act that caused the death of another person; AND 2. When the defendant acted he had a state of mind called malice aforethought." As relevant here, the instruction further informed the jury that it could find appellant acted with implied malice if, "1. He intentionally committed the act; 2. The natural and probable consequences of the act were dangerous to human life; 3. At the time he acted, he knew his act was dangerous to human life; AND 4. He deliberately acted with conscious disregard for human life."

About one month after the trial in this matter, in light of our Supreme Court's decision in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*), CALCRIM No. 520 was modified to state, "An [act/[or] failure to act] is *dangerous to human life* if it involved a high degree of probability that it would result in death." Appellant contends the trial court erred because its instructions to the jury did not refer to the "high degree of probability" language that is now included in the pattern instruction. We disagree.

Our Supreme Court stated in *Reyes* that, "Murder is committed with implied malice when 'the killing is proximately caused by "'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.'"'" (*Reyes, supra,* 14 Cal.5th at p. 988, quoting *People v. Knoller* (2007) 41 Cal.4th 139, 143 (*Knoller*).) The act causing death "must not merely be dangerous to life in some vague or speculative sense; it must

6

"'involve[] a high degree of probability that it will result in death.'"'" (*Reyes,* at p. 989, quoting *Knoller,* at p. 152.)

Historically, implied malice has been defined in two ways. Some courts held that an act is committed with implied malice when it "'involves a high degree of probability that it will result in death.'" (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 103-104.) Others held that an act is committed with implied malice where "'"the natural consequences of [the act] are dangerous to life . . . ."'"' (*Id.* at p. 104.) *Nieto Benitez* concluded these two formulations "actually articulated one and the same standard." (*Ibid.*) "[T]he two linguistic formulations – 'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Id.* at p. 111.)

*Reyes* is not to the contrary. There, our Supreme Court held that a section 1172.6 petition for resentencing should have been granted because there was insufficient evidence the defendant acted with implied malice when he traveled to rival gang territory with other gang members. The court concluded this conduct did not "by itself give rise to a high degree of probability that death will result." (*Reyes, supra,* 14 Cal.5th at p. 989.) *Reyes* did not involve a claim of instructional error, did not disapprove *Nieto Benitez* and did not discuss the many opinions holding that "high probability of death" and "natural consequences dangerous to life" describe the same standard of implied malice. (See, e.g., *Knoller, supra,* 41 Cal.4th at p. 152; *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219; *Watson, supra,* 30 Cal.3d at p. 300.) Because the two standards of implied malice

7

are equivalent, the trial court had no duty to instruct with the "high probability" formulation. There was no error.

Substantial Evidence. Appellant contends there is no substantial evidence he acted with implied malice because there is no evidence he was subjectively aware that his actions involved a high probability of death or that he acted with conscious disregard for human life. We disagree.

*Watson, supra,* 30 Cal.3d 290 held that a person driving while intoxicated could be charged with second degree murder, as opposed to vehicular manslaughter, where there was evidence the driver actually appreciated the risk involved in driving while intoxicated and acted with conscious disregard of that risk. (*Id.* at pp. 296-297.) Thereafter, numerous cases have upheld murder convictions where the defendant drove while intoxicated. "A person who, knowing the hazards of drunk driving, drives a vehicle while intoxicated and proximately causes the death of another may be convicted of second degree murder under an implied malice theory." (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1112, disapproved on other grounds in *People v. Hicks* (2017) 4 Cal.5th 203, 214.) These cases all rely "upon some or all of the following factors in upholding drunk-driving-murder convictions: (1) a blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving." (*People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.)

There is no prescribed formula for determining whether a specific instance of driving while intoxicated is egregious enough to demonstrate implied malice for purposes of a murder conviction. (*People v. Olivas* (1985) 172 Cal.App.3d 984,

8

989.)  Instead, "[t]he question of implied malice is to be decided in light of all the circumstances." (*People v. Moore* (2010) 187 Cal.App.4th 937, 942.)  The circumstances of this collision would allow a rational trier of fact reasonably to conclude that appellant acted with implied malice.

Appellant concedes there is substantial evidence of the first two *Watson* factors.  His blood alcohol content, preliminarily measured at .16 and .164, was well over the legal limit.  Appellant's conduct also disclosed a pre-drinking intent to drive.  He left home in a car to attend a party, knowing he would later drive home.  After the party, appellant chose to continue driving even though he damaged his SUV by crashing it into a fence and some trees.

There is also substantial evidence of the third and fourth factors.  To begin with, the dangers of drunk driving are obvious and well known.  Four decades ago, the *Watson* court noted that, "It may be presumed that [the driver] was aware of the hazards of driving while intoxicated." (*Watson, supra,* 30 Cal.3d at p. 300.)  *People v. Brogna* (1988) 202 Cal.App.3d 700, correctly described drunk driving as "inherently dangerous" and noted that this "simple fact has been made well known to all segments of our society through virtually every form of mass media." (*Id.* at p. 709.)

In addition, appellant was arrested for driving under the influence only three months before this collision.  During that incident, he was given a *Watson* advisement expressly warning that driving while intoxicated is extremely dangerous and could result in a murder charge.  Appellant claims he did not understand the advisement because it was given to him in Spanish, and not in his first language, Mixteco.  The arresting

9

officer testified, however, that appellant appeared to understand the advisement. In addition, appellant complied with the Spanish-language commands he received as field sobriety tests were administered during both arrests. A rational trier of fact could reasonably find that appellant understood the advisement and was subjectively aware of the risks associated with driving while intoxicated.

Finally, substantial evidence supports the conclusion that appellant's driving was extraordinarily dangerous. This collision occurred because, late at night, appellant drove the wrong way down a freeway off-ramp directly into oncoming traffic. This conduct was so dangerous that the fatal crash occurred almost immediately after appellant entered the offramp. Appellant hit the victims' vehicle in the "'gore point,'" where the off-ramp intersects with driving lanes. A rational jury could conclude, based on this evidence, that appellant's driving was highly dangerous and that he acted with implied malice.

Cumulative Error. Appellant contends the cumulative effect of these asserted errors was prejudicial. Because we have found no error, there is nothing to cumulate. (*People v. Cardenas* (2025) 18 Cal.5th 797, 836; *People v. Camacho* (2022) 14 Cal.5th 77, 148.)

*Conclusion*

The judgment is affirmed.

NOT TO BE PUBLISHED.


YEGAN, Acting P. J.

We concur:

CODY, J.        DEROIAN, J.*

_____

\* Judge of Santa Barbara County Superior Court, assigned by the Chief Justice pursuant to art. VI, section 6 of the California Constitution.

10

Michael Frye, Judge

Superior Court County of San Luis Obispo

_____

Laini Millar Melnick, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Shezad H. Thakor, Blake Armstrong, Deputy Attorneys General, for Plaintiff and Respondent.