Filed 7/26/21  P. v. Ingram CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C087900 |
| Plaintiff and Respondent, | (Super. Ct. No. 62144622) |
| v. | |
| PHILIP MORRIS INGRAM, | |
| Defendant and Appellant. | |

Defendant Philip Morris Ingram struck and killed two teenage boys with his pickup truck while driving under the influence of Ambien.  The boys were walking along the dirt shoulder of Highway 49 in Auburn with another boy when defendant's truck veered off the roadway and hit them head-on.  Prior to the fatal collision, a short distance away, defendant sideswiped a parked car and continued driving.  He was convicted by jury of two counts of second degree murder and one count of hit-and-run driving.  The trial court sentenced defendant to serve an indeterminate term of 30 years to life in state prison.

1

On appeal, defendant contends: (1) the evidence is insufficient to support any of his convictions in this case; (2) the prosecutor engaged in prejudicial prosecutorial misconduct by repeatedly misstating evidence; (3) defense counsel provided constitutionally deficient assistance by failing to adequately (a) rebut the prosecutor's misstatements and (b) correct one of the defense expert's inadvertent exaggeration of defendant's Ambien use; and (4) cumulative prejudice requires reversal.

We affirm. As we shall explain, the evidence is sufficient to support each of defendant's convictions. The purported misstatements made by the prosecutor occurred during redirect examination of the prosecution's toxicology expert and during closing argument. We conclude defendant's complaints regarding the prosecutor's closing argument are forfeited and, in any event, fail on the merits. His complaint regarding the prosecutor's questioning of the toxicologist is preserved for review but also fails. Nor are we persuaded defendant received constitutionally deficient representation at trial. Having rejected each of defendant's contentions, we must also reject his assertion of cumulative prejudice.

FACTS

On the afternoon of April 3, 2016, three teenage boys (J., N., & T.) were hanging out at a park in Auburn. J. and T. rode skateboards while N. rode a scooter. Around 5:00 p.m., the boys decided to walk to a coffee shop at the corner of Highway 49 and Dry Creek Road, a short distance to their north. They left the park through an adjacent residential neighborhood and then walked northbound along the dirt shoulder of Highway 49's southbound lanes, facing oncoming traffic as they walked. N. was farthest from the roadway. J. was closest to the roadway, but still on the dirt shoulder. T. was between the two. The boys did not make it to the coffee shop. Defendant's decision to drive while intoxicated would result in him taking the lives of J. and T., and narrowly missing N., leaving the latter boy in a state of confusion and distress on the side of the highway.

2

Before describing the fatal collision, and the hit-and-run accident that preceded it, we provide some background facts about defendant. He was 62 years old and receiving disability benefits at the time of the collision. Defendant's disability resulted from a work-related fall from a scaffold in 1996. In addition to causing defendant chronic pain, for which he was prescribed various pain medications over the years, the fall also resulted in defendant suffering a traumatic brain injury. His doctor noted defendant had some cognitive impairment that he assumed resulted from the brain injury. Cognitive assessments performed in 2011 and 2016 indicated a neurocognitive disorder, symptoms of which included poor verbal communication skills and problems with memory and concentration. Defendant's intellectual functioning scored in "the low-average range" during both assessments.

In addition to pain medication, defendant was also prescribed various medications for depression and insomnia, among other medical conditions, over the years. The Ambien that impaired defendant's driving on the day in question was first prescribed to him in 2014. Although defendant was instructed to take one 10-milligram pill as needed for sleep, he initially took two pills at bedtime and was reminded during a subsequent visit that one pill was the maximum dosage. Other than that, defendant's doctor testified that he did not notice any indications that defendant was misusing his medications. However, Dr. Anna Lembke, the prosecution's expert in "prescription drug overuse and addiction," testified concerning defendant's prescription refill history, contained in a Controlled Substance Utilization Review and Evaluation System (CURES) report, and noted it indicated he was taking more than the prescribed dosage of Ritalin, a stimulant medication. Dr. Lembke also noted it is common for drug users to combine stimulant medications with sedatives like Ambien "to augment the high."

We also note defendant was convicted of driving under the influence (DUI) of alcohol in 2000 and attended a victim impact panel discussing the dangers of impaired driving. According to defendant's testimony, he stopped drinking alcohol about two

years before the fatal collision in this case, i.e., about 2014. As mentioned, that was the same year defendant was first prescribed Ambien. The reason defendant gave up alcohol, according to his testimony, was that it was a "[w]aste of money." However, as Dr. Lembke explained, Ambien "is essentially like alcohol in pill form" when taken at high dosages: "It's a very similar kind of intoxicating phenomenon, both subjectively and in terms of the outward manifestations." These outward manifestations include: "Slurred speech, cerebral ataxia, which means an unstable gait, often lilting to one side or another, having difficulty standing up. That individual would engage in often inappropriate humor because they're not entirely aware of . . . appropriate social signals going on in that moment. That individual would just generally behave in kind of an uninhibited, somewhat euphoric intoxicated way."

Returning to the events of April 3, 2016, defendant testified that he got up around 7:00 a.m., made coffee, watched some television, ate breakfast, and took his morning pills. According to defendant, these morning pills were Prozac, Ibuprofen, and Ritalin. Later in the morning, defendant went to Target and refilled his prescription for Ambien. The label on the pill bottle indicated it contained 60 pills. He placed this pill bottle in the same kitchen cabinet where he kept all of his medications. The prescription came with a paper containing warnings, including "avoid driving and doing other tasks or actions that call [for] you to be alert." Defendant then took a walk, ate lunch, and took his afternoon pills. According to defendant, these afternoon pills were Ritalin, Motrin, and a blood pressure medication. Defendant testified that he had no memory of taking any Ambien that afternoon. In actuality, defendant took at least one, and as many as five, Ambien at some point during the afternoon.

At 4:19 p.m., defendant sent a text message to his son saying he was "[c]oming over." Around 5:00 p.m., while intoxicated by the Ambien in his system, defendant left his house on Northpark Place and got into his truck. From his house, defendant drove onto Parkway Drive and then turned onto Dry Creek Road without stopping for the stop

4

sign at that intersection, drawing the attention of another motorist who had just passed through the intersection. This motorist kept an eye on defendant's truck in his rearview mirror and saw the truck drive outside of the lane on the right shoulder, then overcorrect and cross into the oncoming lane of travel, then overcorrect again and sideswipe a parked car on the right side of the road. Realizing he was in danger with defendant's truck driving erratically behind him, the motorist pulled into a parking lot just before the intersection of Dry Creek Road and Highway 49.

Defendant continued to Highway 49 and turned left, passing another motorist on the right as he did so. This motorist changed lanes to get behind defendant's truck and noticed he was drifting towards the shoulder on the right of the highway. As defendant approached J., N., and T. a short distance down Highway 49, at the start of a slight left-hand curve in the road, defendant was unable to properly negotiate the curve. His truck veered onto the dirt shoulder where the boys were walking and struck J. and T. head-on. J. sustained the more direct hit and was thrown about 60 feet through the air and slid across the ground for about another 120 feet. T. was hit by the truck's right front corner and was thrown about 40 feet through the air and slid across the ground for about another 10 feet. The boys died as a result of the collision.

An analysis of the collision site performed by an expert in traffic accident reconstruction suggested that defendant saw the boys before he hit them. This is because defendant's truck began a sharp correction to the left 77 feet from where the truck went off of the road. This correction occurred 26 feet after he hit the boys. However, based on the speed of the truck (between 57 & 59 miles per hour) and an analysis of perception-response time, the expert opined that the collision itself could not have initiated defendant's sharp steer to the left. In other words, defendant must have perceived the need to steer to the left prior to hitting the boys, but he was unable to begin the movement of steering until after it was too late.

5

After the fatal collision, defendant's truck traveled across both southbound and northbound lanes of Highway 49 and came to rest on the other side of the highway. N., who avoided being struck by mere inches, was left on the southbound side of the highway in a state of shock and confusion. A nurse who witnessed the collision pulled over immediately, handed N. her cell phone to call 911, and attempted cardiopulmonary resuscitation (CPR) on either J. or T. The boy was not breathing and had no pulse. After N. dialed 911, the nurse spoke to the emergency operator and told N. to walk away because she "didn't want him to watch his friend die." Various other motorists who saw the collision also called 911.

Law enforcement and emergency medical personnel arrived on scene within minutes. Deputies Scott Byers and Jeffrey Emery of the Placer County Sheriff's Department were among the first to arrive. They initially approached defendant, who was standing outside his truck drinking a bottle of Listerine mouthwash. Deputy Emery contacted defendant while Deputy Byers reached into the truck, took the keys from the ignition, and then crossed the highway to check on the victims. Emery asked defendant why he was drinking the mouthwash. Defendant said he was a smoker. Emery also asked defendant whether he needed medical attention. Defendant said he did not and started reaching into the truck. When the deputy told him to stop, defendant said he was looking for his driver's license. It was at this point that Emery noticed defendant "was swaying and stumbling" and his speech was "slurred." When the deputy asked what happened, defendant answered: "Well as soon as I looked up he was comin' out of the road on the two-wheelers. [¶] . . . [¶] . . . And, uh, I didn't see him . . . [¶] . . . [¶] . . . knocked him down. I hope he's, okay. I hope he is." A short time later, Emery asked whether defendant knew who "hit the kid," to which defendant responded, "Well I did," and claimed the boy came into the road on a scooter from under one of the guard rails on the side of the highway, adding: "I don't know if he's showin' off for his buddies or what."

6

Suspecting defendant had been driving under the influence of alcohol, Deputy Emery performed an initial DUI assessment and detained him in handcuffs before ultimately turning him over to Officer Patrick Henley of the California Highway Patrol (CHP), who arrived a short time later. Defendant asked Officer Henley why he was being arrested. Henley described his speech as "very slurred" and testified that he "appeared like he was falling asleep on his feet." Because defendant was unstable on his feet, Henley assisted him to his patrol car and performed a more thorough DUI assessment. Defendant failed the field sobriety tests performed by the officer and was placed under arrest.

Officer Henley did not handcuff defendant during his transport to the Auburn CHP office so that he would have the ability to use his cell phone in the back of the patrol car. Defendant did so, calling his son. During the call, Henley overheard defendant say that he hit a kid on a skateboard who rode out in front of him.

Because defendant refused to consent to a chemical test of his blood, a warrant was sought and obtained, and a sample of his blood was taken at 9:37 p.m., more than four hours after the collision. The amount of Ambien in defendant's blood was 0.26 milligrams per liter. A toxicology expert testified that a level of 0.05 milligrams per liter or higher would significantly affect a person's ability to drive. The expert also opined that one Ambien pill taken just before defendant got behind the wheel reasonably could have resulted in a level of 0.26 milligrams per liter when his blood was drawn. However, if the Ambien was taken earlier in the day, one pill would not have resulted in so high a level in defendant's blood at 9:37 p.m. Assuming five pills were taken at noon, the expert opined a level of 0.26 milligrams per liter "may be in the ballpark" of the level he would expect to see at the time of the blood draw assuming another medication defendant was taking was not affecting his body's ability to eliminate the Ambien. Thus, defendant either took one Ambien just before driving or he took between two and five pills earlier in the afternoon.

7

Defendant was searched when he was booked into the jail and two prescription pills were found in his pants pocket. The record does not reveal whether either pill was Ambien, but it does indicate the pills were different medications. As previously mentioned, the Ambien prescription bottle defendant picked up the morning of the collision contained 60 pills. However, during a search of defendant's house, law enforcement found the bottle contained 54 pills. No loose Ambien pills were found in defendant's house or his truck. Thus, of the six Ambien missing from the prescription bottle, it is possible one was in defendant's pocket, leaving five unaccounted-for pills.[1] We also note defendant had a roommate at the time of these events. He denied taking any of defendant's prescription medication at any time.

Relevant portions of the evidence adduced by the defense will be set forth in greater detail in the discussion portion of the opinion, to which we turn momentarily. For present purposes, it will suffice to note the defense position was that defendant did not intentionally take any Ambien on the day of the fatal collision. As mentioned, defendant denied any memory of taking Ambien that day. Thus, he must have done so accidentally, believing he was taking one of his afternoon medications. He also claimed to have no memory of driving anywhere that afternoon or early evening, no memory of hitting either a parked car or two teenagers, and no memory of performing any field sobriety tests. That purported lack of memory, along with testimony from defense experts in forensic toxicology and accident reconstruction, supported the defense argument that defendant was driving in "an Ambien-induced sleep state."

---

[1] With respect to the other prescription bottles in defendant's kitchen cabinet, we note two of these bottles were empty. One of the empty bottles indicated it originally contained 45 pills of Dilaudid, a pain medication. The other empty bottle indicated it originally contained 60 pills of Ritalin.

The prosecution's expert testimony, however, preemptively rebutted any such conclusion. While Dr. Lembke acknowledged there are "very rare" cases of Ambien-induced sleep-driving, her review of the CHP video of defendant's interactions with Officer Henley, including his performance of the field sobriety tests, caused her to conclude defendant was not in a sleep state at that point in time. He was intoxicated. Moreover, his answers to the officer's questions indicated he both saw the teenagers before he hit them and remembered hitting them, neither of which he would have been able to do if he had been unconscious while driving.

## DISCUSSION

## I

### *Sufficiency of the Evidence*

Defendant contends the evidence is insufficient to support any of his convictions in this case. He is mistaken.

### **A.**

### *Standard of Review*

The standard of review is well-settled: "When reviewing a challenge to the sufficiency of the evidence, we ask ' "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' [Citation.] Because the sufficiency of the evidence is ultimately a legal question, we must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt. [Citation.]" (*People v. Banks* (2015) 61 Cal.4th 788, 804.)

" 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary

9

conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) "The same standard governs in cases where the prosecution relies primarily on circumstantial evidence. [Citation.] We 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal. [Citation.]" (*Id.* at pp. 357-358.)

With this standard of review in mind, we shall now assess the sufficiency of the evidence supporting each of defendant's convictions in this case.

**B.**

***Evidence Supporting Defendant's Murder Convictions***

"Murder is the unlawful killing of a human being . . . with malice aforethought." (Pen. Code, § 187, subd. (a).)[2] "[M]alice may be express or implied." (§ 188, subd. (a).) Express malice "requires an *intent to kill* that is 'unlawful' because . . . ' "there is no justification, excuse, or mitigation for the killing recognized by the law." ' [Citation.] [¶] Malice is implied when an unlawful killing results from a willful act, the natural and

---

[2] Undesignated statutory references are to the Penal Code.

10

probable consequences of which are dangerous to human life, performed with conscious disregard for that danger." (*People v. Elmore* (2014) 59 Cal.4th 121, 133.)

"A person who, knowing the hazards of [intoxicated] driving, drives a vehicle while intoxicated and proximately causes the death of another may be convicted of second degree murder under an implied malice theory. [Citation.] A finding of implied malice, unlike a finding of gross negligence, 'depends upon a determination that the defendant *actually appreciated* the risk involved, i.e., a *subjective* standard.' [Citation.] 'Even if the act results in a death that is accidental . . . the circumstances surrounding the act may evince implied malice. [Citations.]' [Citation.]" (*People v. Batchelor* (2014) 229 Cal.App.4th 1102, 1112-1113, disapproved on other grounds by *People v. Hicks* (2017) 4 Cal.5th 203, 214, fn. 3.)

Here, a rational jury could have concluded that defendant's previous DUI conviction and his attendance at a victim impact panel discussing the dangers of impaired driving provided him with the requisite knowledge of the hazards of driving while intoxicated. The jury could also have reasonably concluded defendant knowingly and intentionally ingested an intoxicating amount of Ambien before driving. As stated previously, the evidence supports a reasonable inference that defendant either took one Ambien just before getting behind the wheel or he took between two and five Ambien earlier in the afternoon. Either way, defendant consciously disregarded the danger of driving while under the influence of the intoxicating substance. Moreover, after getting behind the wheel, defendant ran a stop sign and sideswiped a parked car. Continuing to drive after this collision presented a high degree of danger. Thus, even if defendant did not actually appreciate the risk involved prior to driving, the jury could reasonably have concluded defendant must have known how dangerous his actions were after he collided with the parked car.

Nevertheless, defendant argues "the record lacks substantial evidence from which a jury could find beyond a reasonable doubt that [he] knowingly, purposefully, ingested

11

multiple (or any) Ambien" on the day of the collision. Not so. If defendant took one pill just before driving, the likelihood that he did so accidentally is vanishingly small. Indeed, the defense scenario of accidental ingestion is based on the notion that defendant accidentally took Ambien instead of one of his other afternoon medications, i.e., Ritalin, Motrin, and a blood pressure medication. This scenario might be plausible had defendant taken only one Ambien at this time. But the prosecution's toxicology expert testified that taking one Ambien around noon would not have resulted in a level of 0.26 milligrams per liter at 9:37 p.m. Thus, if defendant took the Ambien at this time, he took multiple Ambien. The jury was not required to accept the suggestion that defendant accidentally took multiple Ambien instead of multiple separate medications. The more likely scenario, and one supported by substantial evidence, is that defendant intentionally took Ambien on the afternoon of the fatal collision, either "to augment the high" of his stimulant medication (Ritalin) or simply to become intoxicated from the Ambien.

Defendant takes issue with Dr. Lembke's testimony, calling it "generic" because she "had not examined [defendant], and she did not opine that he was addicted to Ambien." However, one does not need to be addicted to an intoxicating substance in order to intentionally become intoxicated and then get behind the wheel of a motor vehicle. Defendant also cites testimony from both the doctor who prescribed him the Ambien and the defense expert in forensic toxicology, supporting a conclusion that defendant was taking fewer Ambien during the prescription period than was prescribed during that period of time. Indeed, defendant observes, he took only 480 Ambien "over the 628 days [he] had been prescribed Ambien." While true, defendant was prescribed one Ambien per day "as needed for sleep." The fact that defendant did not need one every night does not mean he did not on occasion take an intoxicating amount of the substance. The best evidence that defendant did so is the undisputed evidence that the Ambien prescription bottle defendant picked up on the morning of the fatal collision contained 60 pills when he picked it up and only 54 pills when his home was searched

12

after his arrest. Even assuming one of the pills found in defendant's pants pocket was Ambien, this leaves five unaccounted-for pills. A rational jury could have concluded defendant took these pills intentionally and not by accident.

Finally, relying on *People v. Watson* (1981) 30 Cal.3d 290, defendant challenges the sufficiency of the evidence to establish he took an intoxicating amount of Ambien knowing he would be driving afterwards. Such reliance is misplaced. In *Watson*, our Supreme Court held the evidence supported the prosecution's decision to charge the defendant with implied malice murder where he caused a fatal collision while driving under the influence of alcohol after drinking at a bar.[3] The court explained: "Defendant had consumed enough alcohol to raise his blood alcohol content to a level which would support a finding that he was legally intoxicated. He had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later. It also may be presumed that defendant was aware of the hazards of driving while intoxicated." (*Id*. at p. 300.) The court further relied on defendant's driving, explaining that he "drove at highly excessive speeds through city streets" and "nearly collided with a vehicle after running a red light" before he "resumed his excessive speed" and thereafter caused the fatal collision. (*Id*. at p. 301.)

Defendant argues the evidence is insufficient to support a finding of implied malice in this case because "the undisputed evidence show[s] that [he] took the Ambien at home, after completing his errands, with no plans to go anywhere, and no need to drive." Thus, argues defendant, unlike *Watson*, there is no reasonable inference that he must have known he would have to drive after taking an intoxicating amount of Ambien.

---

[3]     Defendant also presents an argument in his briefing to this court arguing that the Supreme Court should reconsider this holding. We are not the Supreme Court. Indeed, as defendant acknowledges, "this court is bound by the settled rule of *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455." We also decline defendant's invitation to criticize *Watson*.

13

However, as the First Appellate District explained in *People v. Olivas* (1985) 172 Cal.App.3d 984, "nowhere does the opinion in *Watson* state that all of the factors present in that case are necessary to a finding of second degree murder." (*Id*. at p. 988.) Instead, "the presence of those factors was sufficient *in that case* to support a murder conviction." (*Ibid*.) In *Olivas*, as here, there was no evidence the defendant took an intoxicating substance "knowing he would subsequently drive," but that is not required: "The criminal act underlying vehicular murder is not use of intoxicating substances in anticipation of driving, but is driving under the influence with conscious disregard for life." (*Id*. at pp. 988-989.) There, a minor collision preceding the fatal collision "was certainly sufficient to apprise [the defendant] of the risk he was creating." (*Id*. at p. 988.) So too here.

Defendant's second degree murder convictions are supported by substantial evidence.

## C.

### *Evidence Supporting Defendant's Hit-and-run Driving Conviction*

"The essential elements of a violation of [Vehicle Code] section 20002, subdivision (a) are that the defendant: (1) knew he or she was involved in an accident; (2) knew damage resulted from the accident; and (3) knowingly and willfully left the scene of the accident (4) without giving the required information to the other driver(s)." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1123, fn. 10; *People v. Dimacali* (2019) 32 Cal.App.5th 822, 829.)

Defendant argues the evidence is insufficient to support the first two elements of this offense, i.e., that he knew he was involved in an accident causing damage to the parked car on the side of Dry Creek Road. On the contrary, a rational jury could have concluded the only way defendant would not have known these things is if he was in fact asleep at the wheel when he struck the parked car and continued sleep-driving unaware of the collision. The defense provided evidence in support of such a theory. However, as

14

previously explained, Dr. Lembke's expert testimony rebutted the defense evidence regarding Ambien-induced sleep-driving. Although Dr. Lembke did not specifically testify regarding the likelihood defendant was asleep when he struck the parked car, the jury could have concluded from her testimony that he was not asleep when he struck and killed the teenagers on Highway 49 and reasonably inferred that he was also not sleep-driving a short distance away when he struck the parked car on Dry Creek Road. Simply put, the evidence supports a finding that defendant was intoxicated both when he hit the parked car and when he hit the teenagers. And if defendant knew he hit the teenagers, as he admitted at the scene, the jury could also have concluded he knew he hit the parked car causing damage.

Defendant's conviction for hit-and-run driving is supported by substantial evidence.

## II

### *Prosecutorial Misconduct*

Defendant also claims the prosecutor engaged in prejudicial prosecutorial misconduct by repeatedly misstating evidence. These purported misstatements occurred during the prosecutor's redirect examination of the prosecution's toxicology expert and during closing argument. We conclude defendant's complaints regarding the prosecutor's closing argument are forfeited and, in any event, fail on the merits. His complaint regarding the prosecutor's questioning of the toxicologist is preserved for review but also fails.

### A.

### *Standard of Review*

"Under the federal Constitution, a prosecutor commits reversible misconduct only if the conduct infects the trial with such ' "unfairness as to make the resulting conviction a denial of due process." ' [Citation.] By contrast, our state law requires reversal when a prosecutor uses 'deceptive or reprehensible methods to persuade either the court or the

15

jury' [citation] and ' "it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct" ' [citation]." (*People v. Davis* (2009) 46 Cal.4th 539, 612.)

"To preserve a misconduct claim for review on appeal, a defendant must make a timely objection and ask the trial court to admonish the jury to disregard the prosecutor's improper remarks or conduct, unless an admonition would not have cured the harm." (*People v. Davis*, *supra*, 46 Cal.4th at p. 612; *People v. Gamache* (2010) 48 Cal.4th 347, 370-371.) "A claim will not be deemed forfeited due to the failure to object and to request an admonition only when 'an objection would have been futile or an admonition ineffective.' [Citation.]" (*People v. Thomas* (2012) 54 Cal.4th 908, 937.)

**B.**

***Claims Based on the Prosecutor's Closing Argument***

In order to place defendant's complaints regarding the prosecutor's closing argument in context, we first note defendant's doctor's testimony and the CURES report delineating his prescription refill history indicated he had a prescription refill available for Dilaudid on the date of the fatal collision. For whatever reason, defendant did not have that prescription filled when he had the Ambien prescription filled that morning. As mentioned previously, when defendant's house was searched, his bottle of Dilaudid in his kitchen cabinet was empty. According to the label on the bottle, it originally contained 45 pills and was dispensed on March 24, 2016, ten days before the fatal collision. The record does not reveal whether defendant was aware he had a refill available for this medication.

During the prosecution's closing argument, the prosecutor argued defendant intentionally took Ambien in the middle of the day because he was "hooked on powerful drugs and he had no refills available," adding "no refills for his Dilaudid, no refills for Hydrocodone, no refills for Oxycodone. That cabinet that you saw yesterday, no pain

16

pills in it. No pain medications whatsoever. Ambien was the only thing that he had available to him."

During the defense closing argument, defense counsel countered this line of argument: "Prosecution also said that [defendant's] pain pills had r[u]n out. Well, he didn't have any pain pills in his cupboard besides the Motrin, but his prescription had not actually run out. [Defendant's doctor] testified there was a Dilaudid prescription available for pickup at Target on April 3rd of 2016. The same day he filled the Ambien. [¶] So think to yourselves, if [defendant] wanted to get high or wanted to take an excessive amount of pills, why would he have not filled the Dilaudid? We know that Dilaudid is a pain pill. We know that that is the pill that gives you the euphoric effect. That would be the pill of choice if you wanted to get high."

In rebuttal, the prosecutor explained his argument that defendant did not have a prescription for Dilaudid available to be refilled on the day he picked up the Ambien was based on the empty Dilaudid bottle in defendant's cabinet. The prosecutor argued: "And on it, he picked it up [March 24]. There are documents that you'll be able to see, and on it, it says, Refills: No. [¶] So no, he didn't have any refills available. He had no opiates that he had access to. The only thing that he could get from Target at the time was the Ambien, and that's what he got."

Defendant argues this line of argument improperly mischaracterized the evidence. However, his defense counsel did not object to any of these purported misstatements. Defendant has therefore forfeited his claim of prosecutorial misconduct with respect to them unless an objection would have been futile or an admonition would not have cured the harm. (*People v. Thomas*, *supra*, 54 Cal.4th at p. 937.) Defendant argues an objection would have been futile because he objected to two other purported misstatements, the first during the prosecutor's questioning of the toxicologist (discussed below) and the second during closing argument (not raised on appeal), and the trial court overruled these two other objections. We are not persuaded. Where no objection is made

17

to specific instances of alleged misconduct, forfeiture will be excused as futile "where any objection by defense counsel would almost certainly have been overruled." (*People v. Pitts* (1990) 223 Cal.App.3d 606, 692.) This was the case in *Pitts* because, as the court explained, "early on in trial, it became abundantly clear that any objections by defense counsel on the grounds of prosecutorial misconduct would be overruled and requests for admonitions denied or ignored." (*Ibid.*) Such is not the case here. We cannot conclude that the two unsuccessful objections cited by defendant rendered futile further objection to separate claimed misstatements by the prosecutor. Nor are we persuaded by defendant's argument, relying on *Pitts*, that additional objection would have served "to impress upon the jury the damaging force of the misconduct," such that admonitions would not have cured the harm. (*Ibid.*) Defendant has therefore forfeited his claims of prosecutorial misconduct based on the prosecutor's closing argument to the jury.[4]

In any event, we also conclude the claims fail on the merits. "While counsel is accorded 'great latitude at argument to urge whatever conclusions counsel believes can properly be drawn from the evidence [citation],' counsel may not assume or state facts not in evidence [citation] or mischaracterize the evidence [citation]." (*People v. Valdez* (2004) 32 Cal.4th 73, 133-134.) Viewing the totality of the prosecutor's remarks, he

---

**4**     Defendant also takes issue with a related line of argument made by the prosecutor during closing argument, i.e., that defendant "has a history of taking more Ambien than prescribed" and that defendant's doctor "noted that [he] was taking two times the prescribed Ambien, not the one pill he had prescribed." Defendant argues these statements, "[w]hile technically accurate," improperly "slanted the facts and unfairly misled the jury." This claim is also forfeited for failure to object below. Additionally, defendant's appellate briefing does not provide any legal authority supporting his argument that these "technically accurate" statements nevertheless amounted to misconduct. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as [forfeited]. [Citations.]" (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) We mention this portion of defendant's prosecutorial misconduct claims no further.

argued to the jury that notwithstanding the testimony from defendant's doctor and the CURES report, defendant did not have a prescription for Dilaudid available to be filled on April 3 because he picked up that prescription on March 24 and had no further refills available. Whether such an inference was a fair one based on the label of the Dilaudid bottle was for the jury to decide. We simply conclude arguing for it was not a deceptive or reprehensible method of persuasion and did not infect the trial with such unfairness as to make the resulting conviction a denial of due process. (See *People v. Davis*, *supra*, 46 Cal.4th at p. 612.)

## C.

### *Claim Based on Questioning of the Toxicologist*

During redirect examination of the prosecution's toxicology expert, the prosecutor asked: "A person who -- assuming that a collision happens at 5:15 p.m., and a person who is involved in that is arrested. And then there is a phone call several hours later in which that person who is involved in the collision tells the other party that they remember everything that happened, is that consistent with someone being in some type of Ambien-induced sleep state at the time of the original collision?" After defense counsel's objection to this question (as an improper hypothetical that referred to facts not in evidence) was overruled, the toxicologist answered: "That would not be consistent. [¶] Typically, they have total loss of memory of that event."

Defendant argues this hypothetical was not based on the evidence because the phone call upon which the question was based, between defendant and his son, did not happen "hours later," but instead took place the day after the collision. We consider the difference between "several hours later" and "the next day" to be immaterial and manifestly harmless in light of the toxicologist's answer that a person in an Ambien-induced sleep state will typically have a total loss of memory with respect to an event that occurs during that sleep state. In other words, whether several hours later or the next day,

19

the toxicologist would have expected the person described in the hypothetical not to have remembered the event.

Defendant also takes issue with the portion of the hypothetical indicating the person remembered "everything that happened," arguing he never told his son he remembered everything. Instead, when defendant's son asked whether he remembered everything that happened, defendant asked: "What's that?" His son then asked: "Do you remember what happened?" Defendant answered: "Yeah - yeah." His son clarified: "With your truck and everything?" Defendant answered: "Uh-huh." A short time later, defendant told his son he was having difficulty hearing him because the batteries in his hearing aid had gone out. We also consider the difference between remembering "what happened" and remembering "everything that happened" to be immaterial and harmless for the same reason. Stated simply, the toxicologist would have expected a person in an Ambien-induced sleep state to remember *nothing* that happened. Defendant told his son he remembered what happened. Moreover, whether defendant heard his son correctly was a matter for argument, but his subsequent statement that his hearing aid batteries had gone out did not make the prosecutor's hypothetical improper.

Defendant's claims of prejudicial prosecutorial misconduct fail.

## III

### *Ineffective Assistance of Counsel*

Defendant further asserts his trial counsel provided constitutionally deficient assistance by failing to adequately (a) rebut the prosecutor's misstatements and (b) correct the defense expert's inadvertent exaggeration of defendant's Ambien use. We are not persuaded.

### A.

### *Standard of Review*

The standard for reviewing a claim of ineffective assistance of counsel is also well-settled: A criminal defendant has the right to the assistance of counsel under both

20

the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) This right "entitles the defendant not to some bare assistance but rather to *effective* assistance. [Citations.] Specifically, it entitles him to 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate.' [Citations.]" (*Ibid.*) The burden of proving a claim of ineffective assistance of counsel is squarely upon the defendant. (*People v. Camden* (1976) 16 Cal.3d 808, 816.) " 'In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was "deficient" because his "representation fell below an objective standard of reasonableness . . . under prevailing professional norms." [Citations.] Second, he must also show prejudice flowing from counsel's performance or lack thereof. [Citation.] Prejudice is shown when there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' " (*In re Harris* (1993) 5 Cal.4th 813, 832-833, disapproved on another point in *Shalabi v. City of Fontana* (July 12, 2021, S256665) ___ Cal.5th ___ [2021 Cal. Lexis 4762]; *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693].)

With this standard of review in mind, we consider each of defendant's ineffective assistance of counsel claims raised in this appeal.

**B.**

***Asserted Failure to Rebut the Prosecutor's Misstatements***

As previously explained, rather than object to the prosecutor's argument regarding defendant's "supposed inability to get more pain medication" on the day of the fatal collision, defense counsel argued he had a refill for Dilaudid available for pickup that day and cited the testimony of defendant's doctor in support of that assertion. Choosing to argue a matter rather than object to potential prosecutorial misconduct falls within the realm of tactical decisions that are not subject to second-guessing on appeal. Defense

counsel "could have decided to refrain from objecting to avoid drawing the jury's attention to arguments detrimental to the defense case. [Citation.] The decision whether to object to an argument is an inherently tactical one that is not ordinarily reviewable on appeal. [Citations.]" (*People v. Henderson* (2020) 46 Cal.App.5th 533, 549.)

Defendant acknowledges these principles, but argues his trial counsel nevertheless provided ineffective assistance by failing to "effectively, thoroughly, and accurately" argue the matter. According to defendant, his defense attorney's argument was not accurate because defendant's doctor did not testify that a Dilaudid prescription was ready to be picked up that day. Instead, he testified that he called in the prescription in April, but was unaware "[w]hether it was available for pickup or not." The doctor added: "I know it was prescribed . . . and I know it wasn't picked up, but I don't know if it was sitting at the pharmacy, waiting for him." However, defendant argues, the prosecution's investigator did testify that Dilaudid was ready to be picked up, and "[t]hat is what the jury needed to hear." But that is not entirely accurate either. The investigator testified that his review of the CURES report indicated a Dilaudid prescription was "ready to be filled" on April 3, but defendant did not have that prescription filled when he had the Ambien filled. We perceive no material difference between the doctor saying he called in the prescription but it was never picked up and the investigator saying it was "ready to be filled" but defendant "did not pick one up." Both indicate that defendant could have had his Dilaudid prescription filled that day, assuming he was aware, and neither purport to know whether or not a bottle of Dilaudid was waiting to be picked up when defendant arrived at the pharmacy that morning.

We conclude defense counsel's argument in this regard did not fall below an objective standard of reasonableness. Nor has defendant demonstrated a "reasonable probability the outcome would have been different" had his defense counsel directed the jury's attention to the investigator's testimony instead of, or in addition to, that of defendant's doctor. (*People v. Alexander* (2010) 49 Cal.4th 846, 888.)

22

## C.

### *Asserted Failure to Correct the Defense Expert's Misstatement*

The defense toxicologist testified that defendant was first prescribed Ambien on July 16, 2014, and that he was prescribed "about 480 pills" between then and April 3, 2016, adding "that's about 470 days, so that's about 1.0 tablets per day." He further testified that this level of usage was consistent with the prescribed daily use of the medication. Defendant points out there are actually 628 days between July 16, 2014, and April 3, 2016, and argues defense counsel provided constitutionally deficient representation by failing to catch the error and "ensure that [the expert] testified accurately."

We reject this claim based on defendant's failure to demonstrate prejudice. (See *People v. Fairbank* (1997) 16 Cal.4th 1223, 1241 [where " 'it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed' "].) Defendant argues he has shown such prejudice because "the entire trial turned on whether [he] had taken multiple Ambien to get high" and the fact that he in actuality took less than one pill per day over the span of almost two years "would have undercut the prosecution's suggestion that he was abusing Ambien to get high." Defendant also argues the prosecutor exacerbated the prejudice by repeating the defense toxicologist's "inadvertent exaggeration" during closing argument. We are not persuaded.

" 'A defendant must prove prejudice that is a " 'demonstrable reality,' not simply speculation." ' [Citation.] Thus, it is not sufficient to show that the alleged errors may have had some conceivable effect on the trial's outcome. Instead, a defendant must demonstrate a 'reasonable probability' that the result would have been different were it not for the deficient performance. [Citation.] ' "A reasonable probability is a probability sufficient to undermine confidence in the outcome." ' [Citation.]" (*People v. Henderson*, *supra*, 46 Cal.App.5th at pp. 549-550.)

23

Even accepting that defendant took "an average of .76 tablets a day," as we have already explained, he was prescribed one Ambien per day "as needed for sleep." The fact that defendant did not need one every night does not mean he did not on occasion take an intoxicating amount of the substance. The best evidence that defendant did so is the undisputed evidence that the Ambien prescription bottle defendant picked up on the morning of the fatal collision contained 60 pills when he picked it up and only 54 pills when his home was searched after his arrest. Even assuming one of the pills found in defendant's pants pocket was Ambien, this leaves five unaccounted-for pills. Based on all of the evidence, the jury concluded defendant intentionally took an intoxicating amount of Ambien before driving in conscious disregard of the danger this action presented to human life. Our confidence in the outcome is not undermined by defense counsel's failure to correct the defense toxicologist's inadvertent miscalculation regarding defendant's average Ambien usage.

Defendant's claims of ineffective assistance of counsel fail.

## IV

### *Cumulative Prejudice*

Finally, having rejected each of defendant's contentions in this appeal, we must also reject his assertion of cumulative prejudice.

DISPOSITION

The judgment is affirmed.

/s/
HOCH, J.

We concur:

/s/
MURRAY, Acting P. J.

/s/
DUARTE, J.