Filed 8/3/22  P. v. Hill CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CURTIS LEE HILL,<br><br>        Defendant and Appellant. | A160120<br><br>(Contra Costa County<br>Super. Ct. No. 51819093) |

Curtis Lee Hill appeals from a conviction of first degree burglary.  He contends the conviction must be reversed because the trial court's refusal to give a requested jury instruction on trespass violated his constitutional right to present a defense.  He further argues the court abused its discretion in imposing fees and fines at sentencing.  Additionally, in response to our request for supplemental briefing, Hill argues he is entitled to a new sentencing hearing because two of the aggravating factors the trial court relied upon in imposing an upper term sentence are invalid under postsentencing statutory amendments.  We will affirm Hill's conviction and remand for resentencing.

1

## STATEMENT OF THE CASE

A first amended information filed on July 25, 2019, charged Hill with two counts of first degree residential burglary (Pen. Code,[1] § 459), committed on July 25 (count 1) and August 4, 2018 (count 2), and one count of attempted first degree burglary, committed on August 4, 2018 (count 3). It was alleged that Hill had suffered four prior serious or violent felony convictions (§§ 667, subd. (d) & (e), 1170.12, subd. (b) & (c)), two of which were also alleged as prior serious felony convictions under section 667, subdivision (a)(1), and had served a prior prison term for a violent felony (§ 667.5, subd. (a)), and three prior prison terms for felonies (§ 667.5, subd. (b)). Additional prior convictions were alleged for purposes of probation ineligibility.

After a jury trial, Hill was found guilty of first degree burglary on count 2. The jury was unable to reach a verdict on counts 1 and 3, and the court declared a mistrial as to those counts. "Three Strike" prior conviction allegations were submitted to the jury in a bifurcated trial and found true.[2]

At sentencing, the trial court denied Hill's request for probation under the auspices of the Behavioral Health Court, struck two of the prior strikes (all of which arose from a single incident) and the section 667, subdivision (a) enhancement, and imposed the upper term of six years, doubled due to the prior strike, for a total prison term of 12 years. Over defense objection, the court imposed a restitution fine of $300 (§ 1202.4), imposed but suspended a $300 parole revocation fine (§ 1202.45), and imposed a $40 court operations

---

[1] Further undesignated statutory references will be to the Penal Code.

[2] The prior strikes were 1985 convictions, two for residential robbery and one for first degree burglary.

assessment (§ 1465.8) and $30 court conviction assessment (Gov. Code, § 70373).

Hill filed a timely notice of appeal.

## STATEMENT OF FACTS

In July 2018, roommates Kamrin Shaw and Laura Tate were living on Colfax Street in Concord (the Colfax house). On July 24 and 25, Tate was out of town. When Shaw went to bed on July 24, he was the only person at home. When he got up the next morning, he saw some bags in the living room that he did not recognize. Tate's door was closed. Shaw wanted to use the washing machine, which was in Tate's room, but the door was locked; he knocked, and someone said, "Hold on, I'm not dressed yet. Give me a second." Shaw waited a minute or two and knocked again; the person asked who he was, then asked again who he was after Shaw said his name. Shaw had been thinking it must be a friend of Tate's in her room, but at this point, realized something was not right.

Shaw went outside and saw the sliding window for Tate's room was wide open. Looking in, he saw Hill, whom he did not know but identified at trial, run out of the room and toward the front door. Shaw climbed in the window and chased Hill to the front yard. Hill turned, acting as if he had come from a different direction. Shaw grabbed Hill and told him to empty his pockets; Hill struggled and said he didn't know what Shaw was talking about. After a bit more struggle, Hill emptied his front jacket pocket and earrings, change, and trinkets fell out. Shaw reached into Hill's pants pocket and more jewelry fell out, which Shaw recognized as Tate's. Shaw let Hill go, telling him not to come by his house again, and subsequently called the police. One of the responding officers testified there were no signs of forced entry. Shaw later identified Hill in a photographic line up.

3

Tate learned about the break-in while she was still away; when she returned and Shaw showed her the jewelry he had taken from Hill, she recognized it as hers. In her room, drawers that had been completely full were empty, things were missing from her bed and her room "looked like as if it was thrown around."

On August 3, 2018, Tate went out to a party and got home about 2:00 a.m. She found the door to her room locked and it felt like there was something behind it keeping it from budging. She had not left the door locked; it locked only from the inside. Tate went to the alleyway from which she could get to her bedroom window and found the window open wide; she had not left it that way. She climbed in through the window and when she turned on the light, it looked like someone had been there: Things were out of place on her bed, drawers were open, and a chair was behind the door, with its back under the door handle. Tate heard someone in the alley and then heard her window being slid open. She went to the window and saw a man whom she identified at trial as Hill outside trying to open it. She told him to get away from her house and he ran.

Tate called the police and an officer took her to identify Hill, who had been detained at a corner directly behind the house. Hill was in possession of items belonging to Tate that had been on her dresser or in one of her drawers.

The officer who detained Hill recognized him from previous contacts. Hill complied with a directive to stop and began yelling at the officer, who handcuffed and searched him, then had him sit on the curb to wait for Tate to be brought to the scene. Throughout this time, the identification process, and subsequent transport to the jail and further search, Hill responded to and

4

complied with instructions, did not appear to be talking to imaginary people, and did not act out.

Hill was detained at 2:32 a.m. Minutes before, at 2:14 a.m., an officer and trainee officer at the municipal parking garage a block or less from the Colfax house had seen Hill loitering at the garage entrance, appearing to be "yelling at nobody in the middle of the street." The officers contacted Hill, had dispatch check for warrants, and at 2:16 a.m. told Hill to move along, which he did. The officer testified that neither Hill nor his shopping cart were searched. The trainee officer testified that a third officer conducted a quick consent search of Hill's jacket pockets and found only trash. Based on records from police dispatch indicating the officers were "available" at 2:24 a.m., defense counsel attempted to suggest the contact with Hill lasted until 2:24 a.m.; both officers testified Hill was released at 2:16 a.m.

Hill had been arrested at a Safeway on the afternoon of August 3 for challenging an employee to a fight, and had been released from jail around 5:50 p.m.

### *Defense*

Hill testified that he had been living on the streets of Concord since 2005. He had been diagnosed with mental illness—depression and schizophrenia—but does not like to talk about it. He testified that he does not like to take his prescribed medication because it "makes me act different than what I am," but acknowledged he needed medication to make him "stable" and did better on some medications than others. He uses methamphetamine.

Hill testified he had been "51/50ed" many times, referring to the process by which a person may be temporarily taken into custody on probable cause to believe he or she is a danger to self or others as a result of a mental

health disorder (Welf. & Inst. Code, § 5150). Two such occasions were July 18 and July 20, 2018: Both times, Hill refused medication, was involuntarily treated with intramuscular antipsychotic medication, and received a diagnosis of "unspecified schizophrenia spectrum and other psychotic disorders."

Hill testified that members of his family own property in Concord, possibly including the Colfax house. He believed that his family was part of the Nation of Islam in Oakland and their "circle" was involved in the killing of Yusuf Bey IV; that his family was engaged in criminal activity, including "[d]rugs, hookers, pimping and all that" and possibly "human trafficking"; and that there was a federal investigation into his family involving sex crimes and corrupt practices at transitional housing, including the Colfax house. Hill testified that his family had a Web site and "that's where the income's comin' from. The data. You do it all by phones." He had data his family had given him in his phone and he believed he got arrested and "51/50ed" all the time so the police could steal the data from his phone. His family had a "club between them and their police friends," but Hill testified, "I don't know what it is yet."

A police officer who had had multiple contacts with Hill testified that on an occasion when he found broken glass in Hill's pockets during a search and threw it away, Hill became upset, saying "those were diamonds" and appearing to believe this was true. In March 2018, Hill was uncooperative with staff at John Muir Hospital, saying they were trying to take his diamonds and they were witches. Hill testified that he believed there was "a presence of witchcraft" in downtown Concord, in the area around the Colfax house.

6

Hill testified that on July 24, he had fallen asleep at a bus stop near the Colfax house and, when he woke up, three girls asked him to buy them alcohol to take to a get-together at the house. Shaw drove him and the girls to Safeway, where Hill bought a fifth of Grey Goose, two packs of cigarettes, and a 12-pack of beer. Back at the house, they gave him a couple of beers which he took to the bus stop and drank. Hill then returned to the house, the girls came out and thanked him, he shared some medical marijuana he had with them, and in exchange they gave him some jewelry. They suggested he go inside and use the washing machine, so he retrieved his bags from the bus stop and put his clothes in the washer. He passed out in the room and the next thing he knew, Shaw pulled him by his hair, took him outside to the sidewalk, made him empty his pockets, hit him, and pushed him to the ground. Hill felt Shaw robbed him; he did not believe the jewelry in his pockets belonged to Tate.

Asked if he was high on July 25, Hill replied, "I was pain—painkillers, I was drinking booze. I probably had a little . . . some meth." Asked if he was hearing any voices that day, Hill responded that he "heard a lot of things in my mind . . . . Cops, cops, cops. Everybody was polices to me." He testified that he "was in fear of the police" and worried that everyone he came into contact with was police or "workin' for 'em, tryin' to get me."

Hill was arrested on July 26 and released on July 29. He went back to the Colfax house three times because he still had property there he wanted to recover. The first two times, he did not talk with anyone or go inside. The third time, on the morning of August 3, Shaw came outside, grabbed Hill by his hair, and hit him in the eye. Tate also struck him and told him he was going back to jail. Hill's eye was swollen for about a month.

Later that day, Hill was arrested at Safeway and taken to jail, then released that night. He testified that he was not high when he got out of jail. He went to the downtown area, then woke up in the park a little after 2:00 a.m. on August 4; he went to the garage, where he was contacted and searched by police officers. He did not go to Tate's window on August 4: After leaving the garage, he was arrested again within minutes. When Tate came to identify him, Hill told the police Tate was the one who beat him up.

Hill acknowledged having been convicted of theft in 1994, 2009, and 2017, felony receiving stolen property in 2008, and felony grand theft person in 2015.

Dr. Sabina Correa testified for the defense as an expert in psychology and assessment and diagnosis of psychiatric disorders. She explained that "unspecified schizophrenia spectrum and other psychotic disorders" is a "catch-all for the schizophrenia family," used when a person presents symptoms consistent with schizophrenia, but it is too early to say whether there might be some other underlying cause. The predominant symptoms of schizophrenia are hallucinations, delusions, and disorganized thinking and speech.

Correa conducted a clinical interview with Hill and found his thinking "very disorganized" so that it was hard to "have a good timeline of events." She diagnosed Hill with "schizophrenia family, unspecified schizophrenia spectrum and other psychotic disorders," and amphetamine use disorder. She believed Hill had exhibited psychotic behaviors; the primary symptom she saw was disorganized thinking and speech. She did not believe these were due solely to substance abuse and testified that using substances can magnify and amplify, or activate, underlying symptoms of schizophrenia. It

is common for people suffering from psychiatric disorders to use street drugs and to decline prescribed medication.

Correa testified that Hill's delusions about his family were consistent with schizophrenia. She believed he experienced hallucinations as a result of his mental health disorders, although it was difficult to say how much was substance induced and how much due to the underlying schizophrenia symptoms. She acknowledged there is always a possibility that a patient is malingering—faking or exaggerating symptoms—but did not believe this to be the case here, as Hill's presentation was very consistent across her interview and the documents she reviewed, and it is more difficult to fake disorganized thought than hearing or seeing things.

Psychosis can vary over time, with a person able to follow basic directions in a mild phase and unable to in a more acute phase. Correa opined that on July 25, 2018, Hill was psychotic and likely delusional, as well as having disorganized thinking. He believed he had been invited to purchase alcohol and cigarettes for Shaw and his friends and in exchange would be able to wash his clothes and smoke weed with them, and said he believed the property could be one of many his family owned and that items in the home were his; Correa believed these to be delusions. Hill said he had smoked methamphetamine on August 4, which likely would have amplified his underlying disorders. Correa testified that one of the features of Hill's mental health disorders is perseveration—which she defined as meaning "you can't stray from the topic" and "everything comes back to that topic"—and he perseverated on the belief that he had belongings in the house and needed to talk to Shaw to get them back, and that he was the victim whose property had been stolen. He also had paranoid thoughts that the police and his

family were after him, and his thinking about "shiny objects" was also "a bit of a perseveration."

## DISCUSSION

## I.

Hill's primary theory of defense was that due to his mental illness and substance use, he did not have the intent to commit theft required to convict him of burglary. The defense, wanting to argue that Hill committed a trespass by entering the Colfax house without permission, but believing he had a right to be there or to retrieve his property, asked the court to instruct the jury on trespass with CALCRIM Nos. 2931 and 2932. The prosecutor objected and the court stated, "I am not going to give instructions on lesser-related offenses absent agreement of the parties. I believe that is my duty under the law." Hill contends the court's refusal to instruct on the lesser offense improperly required the jury to make the all-or-nothing choice of finding him guilty of the greater offense or not guilty of any offense, deprived him of his right to present a defense, and denied him a fair trial.

Hill's argument is built on caselaw establishing a court's duty to instruct on lesser *included* offenses. " '[W]hen the charged offense is one that is divided into degrees or encompasses lesser offenses, and there is evidence from which the jury could conclude that the lesser offense had been committed, the court must instruct on the alternate theory even if it is inconsistent with the defense elected by the defendant . . . .' " (*People v. Breverman* (1998) 19 Cal.4th 142, 157, quoting *People v. Sedeno* (1974) 10 Cal.3d 703, 717, fn. 7, italics omitted.) This rule "ensures that the jury will be exposed to the full range of verdict options which, by operation of law and with full notice to both parties, are presented in *the accusatory pleading itself* and are thus closely and openly connected to the case." (*People v. Birks*

10

(1998) 19 Cal.4th 108, 119 (*Birks*).) " 'Just as the People have no legitimate interest in obtaining a conviction of a greater offense than that established by the evidence, a defendant has no right to an acquittal when that evidence is sufficient to establish a lesser included offense.' " (*Breverman*, at p. 155, quoting *Sedeno*, at p. 717, fn. 7.) The requirement that the jury be instructed on lesser included offenses "encourages a verdict, *within the charge chosen by the prosecution*, that is neither 'harsher [n]or more lenient than the evidence merits.' " (*Birks*, at p. 119, quoting *People v. Wickersham* (1982) 32 Cal.3d 307, 324, italics added.)

The situation is different with lesser *related* offenses: Our Supreme Court has held that "instruction on a lesser related offense is proper only upon the mutual assent of the parties." (*People v. Taylor* (2010) 48 Cal.4th 574, 622 (*Taylor*); *Birks*, *supra*, 19 Cal.4th at pp. 112–113.) Unlike the requirement of instructions on lesser included offenses, which applies evenhandedly to both parties, allowing the defense to compel instructions on lesser related offenses would be unfair to the prosecution, which cannot obtain a conviction on an uncharged, nonincluded offense. (*Birks*, at pp. 127–128.) Moreover, unlike instructions on lesser included offenses, requiring instructions on lesser *related* offenses at the unilateral request of the defense would "interfere with prosecutorial charging discretion." (*People v. Hicks* (2017) 4 Cal.5th 203, 211; *Birks*, at pp. 127–130, 134–135.)

As Hill recognizes, trespass has been held to be a lesser related offense of burglary. (*People v. Foster* (2010) 50 Cal.4th 1301, 1344; *Taylor*, *supra*, 48 Cal.4th at p. 622; *Birks*, *supra*, 19 Cal.4th at p. 118, fn. 8.) Hill argues, however, that these cases at most establish trespass is not a lesser included offense of burglary under one of the two tests for determining whether an offense is a lesser included offense, the statutory elements test. Under the

11

alternative accusatory pleadings test, he maintains, trespass was a lesser included offense of burglary in the present case and the trial court was required to instruct the jury accordingly.

"An uncharged offense is included in a greater charged offense if *either* (1) the greater offense, as defined by statute, cannot be committed without also committing the lesser (the elements test), *or* (2) the language of the accusatory pleading encompasses all the elements of the lesser offense (the accusatory pleading test)." (*People v. Parson* (2008) 44 Cal.4th 332, 349.) Trespass is not a lesser necessarily included offense of burglary under the statutory elements test "because burglary, the entry of specified places with intent to steal or commit a felony (§ 459), can be perpetrated without committing any form of criminal trespass (see § 602)." (*Birks*, *supra*, 19 Cal.4th at p. 118, fn. 8.)  Trespass is entry of a residence without consent of the owner or person in lawful possession (§§ 602, subd. (m), 602.5, subd. (a)), but "[a] burglary may be committed by one who has permission to enter a dwelling." (*People v. Lohbauer* (1981) 29 Cal.3d 364, 369 [violation of section 602.5 not lesser included offense of burglary].)

Hill's contention that trespass was a lesser included offense of burglary under the accusatory pleadings test is unavailing.  When the allegations of the information track the statutory language defining the offense, only the statutory elements test applies.  (*People v. Licas* (2007) 41 Cal.4th 362, 366.) That is the case here:  The first amended information charged Hill with committing first degree residential burglary in that he "did enter an inhabited dwelling house and trailer coach and inhabited portion of a building occupied by Lara Tate, with the intent to commit larceny and any felony."

12

Hill maintains trespass was a lesser included offense of burglary under the accusatory pleadings test because the information "effectively" charged him with "unlawful entry or trespass." Although he acknowledges that "neither the phrase nor the concept of unlawful entry is used in the statutory definition of burglary," he maintains that he "was charged with unlawfully entering a residential dwelling without the permission of the owner" and, because lawful entry of a residential dwelling requires permission of the owner or lawful occupant, he was in effect charged with trespass.

We disagree. The information makes no reference to consent of the owner or lack thereof, and lack of consent is not implied by its language. As we have said, lack of consent is not what makes an entry unlawful for purposes of burglary; the entry is rendered unlawful by the defendant's intent to commit a theft or other felony. Thus, contrary to Hill's argument, entry without consent is *not* necessarily included in the allegation that he entered the residence with "intent to commit larceny and any felony," and trespass is not a lesser necessarily included offense under the accusatory pleadings test.[3]

Nor can Hill prevail on his claim that the trial court's refusal to instruct on trespass violated his due process right to instructions on his theory of defense. "[R]efusing to grant a defendant's unilateral request for

_____

[3] Arguing that cases have not yet resolved whether trespass can be a lesser included offense under the accusatory pleading test, Hill points to *People v. Waidla* (2000) 22 Cal.4th 690, 733. As Hill acknowledges, *Waidla* accepted "[f]or purposes of discussion only" the defendant's assertion that trespass should be deemed a lesser included offense of the charged burglary because trespass "comprises supposedly the same elements with the pertinent exception of" intent to commit larceny. (*Ibid.*) The *Waidla* court did not resolve the issue because it found no evidence to support the theory that the defendant entered the victims' property with intent to take only items as to which he believed he had a right or claim. (*Id.* at pp. 734–735.)

13

instructions on a lesser related offense does not violate any 'constitutional due process right to present the "theory of the defense case . . . ." ' " (*Taylor*, *supra*, 48 Cal.4th at p. 622, quoting *People v. Rundle* (2008) 43 Cal.4th 76, 148, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421.) " '[T]here is no federal constitutional right of a defendant to compel the giving of lesser-related-offense instructions.' " (*People v. Foster*, *supra*, 50 Cal.4th at p. 1344, quoting *Rundle*, at p. 148.)

Hill argues the federal due process clause required an instruction on trespass because, since it was undisputed that he entered without permission, he had "no real defense" to his entry into the house without such an instruction. Again, permission was not the issue: The question presented to the jury was whether Hill "entered a room within a house" and, when he did so, "intended to commit theft." (CALCRIM No. 1700.) Hill's defense was that he lacked the necessary intent to steal. As to count 2—the August 4 burglary for which he was convicted—Hill testified that he was not in Tate's room at all; if he was, his attorney argued, it was because, due to mental illness and/or substance abuse, he believed he had a right to be there. Either way, he did not intend to steal anything and he believed the items found in his possession were his. Hill was not prevented from presenting evidence in support of this defense, including his own testimony and evidence of his mental illness, substance use and delusional thinking, and the jury instructions fully addressed the issues raised by his defense with respect to his intent in entering the house.[4]

---

[4] The jurors were instructed that they could not find Hill guilty of burglary if they had a reasonable doubt whether he had the intent to commit theft; that he did not have the intent to commit theft if he had a good faith belief that he had a right to the property; that he could hold a belief in good faith even if it was mistaken or unreasonable; that he was not guilty of

Hill complains that the refusal to instruct on trespass left the jury with an all-or-nothing choice, potentially leading jurors to convict him of burglary even if they were not convinced he had the intent to steal because otherwise he would escape punishment for entering the house without permission. (*People v. Webster* (1991) 54 Cal.3d 411, 444, fn. 17 ["jury should not be confronted with an 'all or nothing' choice when it believes that the accused is guilty only of a lesser included offense"].) This argument is based on concerns expressed in the caselaw on lesser *included* offenses. (*People v. Hicks*, *supra*, 4 Cal.5th at p. 211; *People v. Gonzalez* (2018) 5 Cal.5th 186, 200; *Birks*, *supra*, 19 Cal.4th at p. 119; *Webster*, at p. 444, fn. 17.) As we have explained, the considerations are different with lesser related offenses.

The trial court did not err in refusing to instruct on trespass.

## II.

As noted above, the trial court sentenced Hill to 12 years in prison, imposing the upper term of six years for the burglary conviction, which was doubled due to Hill's prior strike conviction. When Hill was sentenced in February 2020, section 1170, subdivision (b), gave the trial court broad discretion to decide which of the three terms specified for an offense would best serve the interests of justice. (See § 1170, subd. (b), as amended by Stats. 2020, ch. 29, § 14.)

Subsequently, effective January 1, 2022, section 1170 was amended in a number of respects, two of which are relevant to this case. First, Senate Bill No. 567 (2021–2022 Reg. Sess.) made the middle term of imprisonment

---

burglary if he did not have the required mental state because he did not know a fact or mistakenly believed a fact and his conduct would have been lawful under the facts as he believed them to be; and that his voluntary intoxication and/or mental illness could be considered in deciding whether he had the requisite intent.

the presumptive sentence. (§ 1170, subd. (b)(2), as amended by Stats. 2021, ch. 731, § 1.3.) Under the amended statute, "[a] trial court may impose an upper term sentence only where there are aggravating circumstances in the crime and the defendant has either stipulated to the facts underlying those circumstances or they have been found true beyond a reasonable doubt. (§ 1170, subd. (b)(1)–(2).)" (*People v. Flores* (2022) 75 Cal.App.5th 495, 500.) The court may, however, "consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury." (§ 1170, subd. (b)(3).)

Second, Assembly Bill No. 124 (2021–2022 Reg. Sess.) created a presumption in favor of the lower term where specified circumstances were "contributing factor[s] in the commission of the offense," unless the trial court finds that "the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice." (§ 1170, subd. (b)(6); Stats. 2021, ch. 695, § 5.) One of the specified circumstances is that the defendant "has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." (Pen. Code, § 1170, subd. (b)(6)(A).) "[P]sychological trauma based on mental illness may be a circumstance qualifying for the lower term presumption in section 1170, subdivision (b)(6)." (*People v. Banner* (2022) 77 Cal.App.5th 226, 241.)

The parties agree that these amendments apply retroactively to this case as "an ameliorative change in the law applicable to all nonfinal convictions on appeal. (*People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 308.)" (*People v. Flores* (2022) 73 Cal.App.5th 1032, 1039.) They disagree, however, as to whether remand is required. Hill argues we should reduce his sentence to the lower term for burglary, or remand for resentencing, because

16

only one of the aggravating factors the trial court relied upon remains valid and the court found two mitigating circumstances. The Attorney General maintains remand is not necessary because all the aggravating factors either remain valid, were admitted in Hill's testimony, or would have been found true beyond a reasonable doubt if submitted to the jury.[5]

In selecting the upper term, the trial court found five aggravating circumstances: the victim was vulnerable (Cal. Rules of Court,[6] rule 4.421, subd. (a)(3)); Hill's conduct indicates a danger to society (rule 4.421, subd. (b)(1)); Hill's prior convictions are numerous (rule 4.421, subd. (b)(2)), he had served a prior prison or jail term (rule 4.421, subd. (b)(3)), and his prior performance on probation or parole was unsatisfactory (rule 4.421, subd. (b)(5)). The court found two mitigating circumstances: the stolen items were not of great monetary value (rule 4.423, subd. (a)(6)) and Hill suffered from a mental condition (rule 4.423, subd. (b)(2) & (c)).[7] The court also noted

---

[5] Hill did not raise the amendment of Penal Code section 1170 as an issue on appeal. At our request, the parties submitted supplemental briefs addressing whether the statutory changes apply and, if so, whether the case should be remanded for resentencing. Hill's supplemental brief does not address Assembly Bill No. 124 and the resulting provision for a presumptive lower term in the circumstances described in section 1170, subdivision (b)(6). The Attorney General notes the potential application of this provision to Hill but argues it does not require remand.

[6] Further references to rules will be to the California Rules of Court.

[7] Rule 4.423, subdivision (b)(2), provides: "The defendant was suffering from a mental or physical condition that significantly reduced culpability for the crime." The trial court did not determine whether Hill's mental condition "significantly reduced culpability for the crime," noting that was "[t]he more difficult question" and explaining that even if the mental condition did not significantly reduce Hill's culpability, the court would consider his mental condition a circumstance in mitigation under rule 4.423, subdivision (c), which allows consideration of unenumerated factors that "reasonably relate" to the defendant or circumstances of the crime.

17

that it was not imposing the five-year enhancement for Hill's section 667, subdivision (a), prior.

Hill concedes that the trial court's reliance upon his criminal history remains valid: He acknowledges that his "prior criminal history was proven by way of a certified record of conviction" and therefore "a valid factor to support the upper term" under section 1170, subdivision (b)(3). This concession in fact attempts to conflate three separate aggravating factors (numerous prior convictions, prior prison or jail term, unsatisfactory performance on probation or parole) into one—a conflation necessary to Hill's argument that because the other aggravating factors the trial court relied on are invalid, the two mitigating factors outweigh the single valid aggravating factor. In any case, all three aggravating factors related to Hill's criminal history are supported by the record: Three Strike priors were found true by the jury, and Hill testified that he had suffered five prior convictions and had gone to jail and "done his time."

Hill contends the aggravating factors of vulnerability of the victim and conduct presenting a danger to society are invalid because they were neither admitted nor found beyond a reasonable doubt by the jury. The Attorney General counters that any error in failing to submit these aggravating factors to the jury was harmless because the evidence supporting them is so overwhelming that it is beyond reasonable doubt they would have been found true by the jury.

The Attorney General's argument is not convincing. Rule 4.421, subdivision (a)(3), applies where the victim "was *particularly* vulnerable"; subdivision (b)(1) refers to the defendant having "engaged in violent conduct that indicates a *serious* danger to society." (Italics added.) These are factors that require "an imprecise quantitative or comparative evaluation of the

18

facts." (*People v. Sandoval* (2007) 41 Cal.4th 825, 840.) *Sandoval* cautioned that "to the extent a potential aggravating circumstance . . . rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*Ibid.*)

Here, the trial court found the victim was "vulnerable" because she was a former foster child living in transitional housing for children who have aged out of the foster care system and children in the foster care system are "some of our most vulnerable children." But a jury asked to determine whether Tate was "*particularly* vulnerable" (rule 4.421, subd. (a)(3)), might not have seen it the same way, especially in light of Tate's testimony that she was upset but not afraid.

Similarly, with respect to rule 4.421, subdivision (b)(1), the court found Hill presented a danger to society because of the "dangerous situation that . . . residential burglary can create," viewing the evidence that Hill was "attacked or punched" by one of the residents as "an example of how residential burglary can lead to danger" for both victims and offenders. The Attorney General notes that Hill returned to the apartment despite being chased and warned to stay away as indicating he posed a danger to society. While a jury might have shared this view, it might also have seen this burglary as involving less actual or potential violence than many residential burglaries: No weapons were involved, and Hill fled as soon as he was confronted by the victim.

In short, we cannot say with any confidence that a jury asked to determine whether the prosecution proved these two aggravating factors beyond a reasonable doubt would have found them true.

Nor can we assume the trial court would have imposed the upper term if the only applicable aggravating factors were those based on Hill's criminal history. As we have said, the trial court found that both Hill's mental condition and the fact that the property he stole was not of great monetary value were mitigating factors. Not only would the trial court need to weigh the reduced number of aggravating factors against these mitigating factors, it would need to do so in light of a statutory presumption in favor of the middle term. The amendment of section 1170 changed the context within which a trial court exercises its sentencing discretion and " '[d]efendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. (See *United States v. Tucker* (1972) 404 U.S. 443, 447; *Townsend v. Burke* (1948) 334 U.S. 736, 741.)' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391, quoting *People v. Belmontes* (1983) 34 Cal.3d 335, 348, fn. 8.)

Additionally, Hill's mental condition could potentially trigger the statutory presumption in favor of a *lower* term under section 1170, subdivision (b)(6). As noted above, "psychological trauma based on mental illness may be a circumstance qualifying for the lower term presumption in section 1170, subdivision (b)(6)" (*People v. Banner*, *supra*, 77 Cal.App.5th at p. 241) if it is found to be "a contributing factor in the commission of the offense." (§ 1170, subd. (b)(6).) The Attorney General maintains the trial court's selection of the upper term despite finding Hill's mental condition to be a mitigating factor "strongly suggests" the court would find imposition of the lower term contrary to the interests of justice. This may be true, but we cannot simply assume so. It is a decision for the trial court to make under the standards of the amended section 1170.

Remand for resentencing is required.

## III.

As earlier indicated, over Hill's objection that he did not have the ability to pay, the trial court imposed a minimum restitution fine of $300 (§ 1202.4), a $40 court operations assessment (§ 1465.8), a $30 court conviction assessment (Gov. Code, § 70373), and imposed but suspended a $300 parole revocation fine (§ 1202.45). Acknowledging that Hill "does not have significant financial resources," the court noted that it took what it assumed to be his current lack of funds into consideration in selecting the minimum restitution fine rather than a larger amount, and stated that Hill was receiving a "significant" prison sentence with "the possibility that he could be employed while in prison." Citing *People v Johnson* (2019) 35 Cal.App.5th 134, 136–137, the court stated that "the idea that Mr. Hill cannot afford to pay $300 while serving a 12-year prison sentence is unsustainable."

Hill contends the trial court abused its discretion because the evidence of his mental illness, multiple involuntary commitments, lack of work history and longstanding homelessness shows he is unemployable and the record contains no evidence regarding his eligibility for, or the availability of, prison employment. These are circumstances that distinguish the present case from *People v. Johnson, supra*, 35 Cal.App.4th 134, in which the defendant had worked on and off and had sufficient funds to own and use a cell phone and to pay for a hotel room. But it was Hill's burden to establish he would be ineligible for prison work assignment. (*People v. Frye* (1994) 21 Cal.App.4th 1483, 1487.) Hill objected to imposition of the fees and fine on the general ground of inability to pay, but offered no argument that he would be ineligible for paid work in prison due to his mental health condition or otherwise.

21

Nevertheless, as the trial court will reconsider the length of Hill's sentence on remand, it is appropriate for it to reconsider its decision on fees and fines as well.  At a minimum, since the court's conclusion that Hill did not lack ability to pay the amount ordered was based on the length of his prison sentence, the court would need to revisit that conclusion if it imposes a shorter sentence on remand.[8]

## DISPOSITION

The judgment of conviction is affirmed.  The matter is remanded for resentencing in light of section 1170, subdivisions (b) and (c), as amended by Senate Bill No. 567 and Assembly Bill No. 124, and reconsideration of fees and fines, consistent with the views expressed in this opinion.  In all other respects, the judgment is affirmed.

---

[8] First degree burglary is punishable by a prison term of two, four, or six years.  (§ 460.)  Accordingly, with the term doubled due to Hill's prior strike conviction, his sentence could be reduced to eight years if the court chooses to impose the middle term or four years if it chooses to impose the lower term.

_____

Mayfield, J.*

We concur:

_____

Stewart, Acting P.J.

_____

Miller, J.

*People v. Hill* (A160120)

     * Judge of the Mendocino Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.